IN RE ESTATE OF ELIZA KOLLER.

IDA CRAIG, APPELLEE, v. KATE WESTERHOFF, APPELLANT.

FILED APRIL 10, 1928. No. 25965.

*Thomas & Vail* and *McKillip & Barth,* for appellant.

*Harry L. Norval, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and HOWELL, JJ.

HOWELL, J.

This is an appeal from a verdict and judgment of the district court establishing the last will of Eliza Koller who died June 17, 1926, leaving two daughters, Kate Westerhoff and Ida Craig, as sole heirs. The will was executed November 14, 1925, when testatrix was over 80 years of age, there being some discrepancy as to her precise age. The date of birth is said to have been in 1840. That would make her 85 years old at the date of the will, and 86 when she died. Her husband predeceased her on July 30, 1925.

This litigation is principally between the sisters. The real question before us is fraud or undue influence as af-

fecting the devise of the residue of the estate to Ida Craig, to the entire exclusion of her sister, Kate Westerhoff, after paying minor bequests to others. There was ample evidence to support a finding that the testatrix, Eliza Koller, was of disposing mind when the will was executed.

The substantial evidence establishes about the following facts: Kate and Ida were on normal sisterly terms until after September 2, 1925, and apparently until the date of the will. Both daughters were married and, in so far as their opportunities of visiting their parents were concerned, neither seems to have been wanting in affection for their mother. Kate lived near the parents, while Ida lived at greater distances, sometimes in Nebraska and sometimes in other states. By mutual agreement between the sisters, formal applications were made to appoint Kate as administratrix of the estate of the father and guardian of the person and property of the mother. Those arrangements were made at the office of an attorney where the whole matter was fully discussed and the necessary papers drawn. The sisters and the attorney together took the papers to, and filed them in, the county court. Personal service of the guardianship papers was made by the sheriff upon testatrix. Kate's appointment was favored by Ida as a matter of economy, Kate being willing to divide her compensation with her sister. For a time there was no complaint from any source. As too frequently happens, neighbors indulged in more or less gossip which, it is proper to say, resulted in some scandal concerning the relative treatment by the sisters of their mother. Both sisters regarded the care of the mother, as more or less burdensome. They discussed the mental state of the mother, as to her insanity, about which the record shows disagreement among the witnesses.

On September 2, 1925, while Kate and Ida were working at common purposes to save the estate of the father for themselves, and to throw about the mother the protection of a guardian to prevent her squandering it, some correspondence passed between them. Ida executed a paper

consenting to Kate's appointment as administratrix of the father's estate. She wrote Kate a letter saying: "I sure was surprised to think that some people was so little as to stick in our business and have the lawyers get the little us girls ought to have. * * * We will have to do something and mabey what we were talking about. With lots of love, Ida." As to "what we were talking about," Ida could not remember. Kate testified that it related to having the board of insanity investigate her mother's condition. Ida did not deny it.

The letter from Kate to Ida of September 2, 1925, acknowledges a letter from Ida. Kate's language was not any too refined, but it stated the housekeeper, the mother and some lawyer were making statements that Kate was incompetent to handle the business and that Kate had fought against her folks and was antagonistic to them. This was followed with statements of a character calculated to prejudice Kate in the mind of her mother, and a reference to preparation for the trial of the administratrix and guardianship proceedings.

The letter from Ida to Kate above quoted from was evidently in answer to the one just referred to. In referring to the trial Ida said: "If you need me, the boy and I can come any time. * * * * I will stop on my way up town and find out the phone number of my nearest neighbor. We will have to do something and mabey what we were talking about." On the back of that letter a telephone number was written.

Ida got into communication with an attorney about September 15, 1925, who went to Council Bluffs to see her. She turned Kate's letter of September 2, 1925, over to the attorney, who represented both the proponent of the will and testatrix on her application to set aside the appointment of Kate as administratrix and guardian. On September 19, 1925, testatrix wrote an attorney: "I want you to come and make my will. Come down and make it soon." Later, on November 11, 1925, testatrix wrote the same attorney: "I want you to come and make my will.

You hafe not made it yet. I want to give some to Willie Koller at Omaha and some to M. E. Church and some to my friends and the rest to my daughter, Ida Craig. I don't want my daughter, Kate Westerhoff, to hafe annything."

Shortly after November 11, 1925, the attorney went to the home of testatrix, taking with him Kate's letter of September 2, 1925, and the court files relating to both the appointment of Kate as administratrix of her father's estate and guardian of her mother. The attorney testified he received the letter from Kate and he took it and the two court files along and explained them to the testatrix because he wanted to show "her how her daughter had treated her." It is clear from the record that by that time the testatrix had become flagrantly incensed against Kate. No explanation was made to the testatrix as to the part Ida had been taking in having Kate appointed administratrix and guardian.

The old lady complained to many of her neighbors about Kate's treatment and about having a guardian over her. She manifested a feeling of resentment toward Kate which had not theretofore existed. Prior to, and even after the death of, the father, Kate was much at the home of her parents, did many things for them, stayed at the home for days and even weeks, helped to do the work about the home, etc.

A Mrs. Dunton, apparently a most excellent woman, testified for proponents and said that her feeling for Kate was kindly "up until it just seems as though she didn't treat her mother like she ought to." Mr. Kahle, and other witnesses for proponent, testified that testatrix complained to him about the guardianship and that she said "she blamed it all on Kate," also, that testatrix told him that Kate was going to put her in the asylum "if she wouldn't behave herself." Alice Dillenbeck, a witness for proponent, said she had nothing against Kate "only the way she had treated her mother." None of these witnesses testified to any personal knowledge of bad treatment. Mrs.

Shaw said she was prejudiced against Kate because "the way she heard she had treated her mother." She heard it talked about sending testatrix to the asylum, but nothing of that kind from Mrs. Koller. Walter Best said testatrix complained to him about Kate being guardian. Most of the witnesses for proponent either manifested an open, or ill-concealed, prejudice against Kate. Mrs. Dunton and Mr. Norval, people of standing and character, hearing one side only, manifested a decided prejudice against Kate because of the treatment said to have been received by her mother at her hands. After the will was executed, Mr. Norval testified it was put "in our vault in our office." Ida testified she first learned of the will during her mother's last sickness in Omaha; up to the death of the father her relations with her sister were friendly and normal— no estrangement; Tuesday or Wednesday after the funeral of her father she and Kate went with the sheriff to her mother when administration papers were served upon the mother; admitted being at the office of the attorneys who prepared the administration and guardianship papers; denied that she knew what they meant; admitted that she went to the courthouse with the attorney when the papers were filed; was at her mother's home when the sheriff served the papers and discussed the matter of Kate acting as administratrix without charge; changed her mind about Kate being administratrix in September, 1925; admitted that she stated to Mr. and Mrs. Omar Westerhoff, "I am so glad that Kate will act as administratrix of the estate and guardian of mother; we now have it all settled and I can go home," this being shortly after the father's death; saw her mother in August, 1925, on October 1, 1925, and on Christmas, 1925.

Attorney Stoner testified, and it is not denied, that on August 4, 1925, Kate and Ida were in his office; that they talked over the matter of Kate acting as administratrix and guardian; everything was explained in detail to Ida; he told Kate if the mother was as bad as Ida and she stated she was, a guardian would have to be appointed to

take care of both her person and her property, and both girls talked of the then insanity of the mother. Both Kate and Ida testified that they had planned together to save the mother's property for themselves as they were entitled to the same as her daughters.

The estate had a valuation of upwards of $13,000. The will gave to William W. Koller, of Omaha, at whose home the testatrix died, $1,000; to the Methodist Church, $300; to Cynthia Best, $50; to Mary Kahle, $50; to Mary Bills, the housekeeper who was unfriendly to Kate, $300; and the residue to Ida Craig.

Among other grounds of contest it was alleged that the will was procured by undue influence through insidious propaganda to influence Eliza Koller against her daughter, Kate. We cannot resist the conclusion that Ida Craig, with the aid of others, released a letter of September 2, 1925, written to Ida by Kate when they were working at common purposes, and that the community in which testatrix lived, being a small town, was thereby, as Ida intended it should be, more than filled with a rivalry of gossip aimed exclusively at Kate, all of which, and more, got to the ears of testatrix. It is inconceivable that Ida was not a party to that systematic project. Ida's connection with the things that so offended the testatrix were not explained to her. No doubt the alleged conduct of Kate was laid bare before the testatrix in the most offensive and exaggerated form of which evil intent could avail itself. Ida knew the facts, but did nothing to bring down upon her head the consequences of her participation therein, all the while keeping herself within the background until the influence thereof had dealt the lethal blow to her mother's affections for Kate.

William W. Koller, one of the legatees and witness for the probate of the will, testified that the testatrix's conduct was all right with him, but "once in a while she got righteous indignation."

The record shows that the testatrix had been in feeble health for more than a dozen years; she had ceased to

attend church for that length of time; she was formerly an active church worker; she had practically lost the use of her hands and could no longer do quilting for the church; she had frequent violent attacks which at times left her unconscious, and was a woman of strong prejudices.

Undue influence may consist of setting up mental disturbances calculated to direct the mind into channels not normally proper or natural; arousing bitter feeling that would be unwarranted if the whole truth were known; a system of secret propaganda put on foot by broadcasting half truths so directed that they will, in all probability, reach the person to be affected to the injury or prejudice of another who is ignorant of what is going on and thereby deprived of an opportunity to place himself in the true light to prevent his undoing. Ordinarily, one sister would not take delight in deliberately exposing another to contempt and hatred, certainly not to that of the mother in her few remaining days, without a motive.

We have examined the propositions of law stated by appellee and the authorities there cited. Under proper facts, they cannot be questioned. Kate was a woman about 55 years of age; she was married when 16, and has lived with her husband and raised a family. A possible indiscretion of hers with the man whom she married and with whom she has lived almost 40 years in apparent successful wedlock ought not to have been projected into the trial. The jury found that the testatrix had mental capacity to execute a will. With that conclusion we agree. The record is too large to attempt to reflect all the facts in detail; however, from a due consideration thereof we have concluded that the judgment below be affirmed in part and reversed in part. As to all of the legatees, except Ida Craig, we think that there was not sufficient evidence, as a matter of law, to charge them with undue influence. As between Ida Craig and Kate Westerhoff, we do think, as a matter of law, the disinheriting of Kate and the devise to Ida of the entire residue of testatrix's estate were

brought about by undue influence and fraud. This brings us to the law applicable to the situation. No one should be permitted to profit by .his own wrong, nor should others be made to suffer by such wrong. To prevent a wrong-doer's profiting by her own acts, at the same time to do .no injustice to others, it seems appropriate to cancel the legacy to Ida Craig and to subject the same to the inheritance laws, but to otherwise sustain the will. No wrong will then be done to any one.

It is certain from this record that neither the $50 legacies nor that of the Methodist Church were in the remotest degree . connected with any fraud or undue influence. As to the legacies to William W. Koller and Mary Bills we think there was testimony to go to the jury on the issue of undue influence, although that might be open to serious question.

The following cases relate to legacies procured by undue influence: *Randolph v. Lampkin,* 90 Ky. 551, 10 L. R. A. 87: "While a will may be valid as to one devisee, and on account of undue influence invalid as to another, one portion of a . will cannot be rejected for want of testamentary capacity."

*Snodgrass v. Smith,* 42 Colo. 60, dealing with eight bequests and undue influence as to only one: "Where such conditions exist, the will should not have been *refused probate* as to the undisputed legacies."

*Holmes v. Campbell College,* 87 Kan. 597, 599: "A portion of a will may be refused probate because of undue influence, while the remainder is admitted. *In re .Welsh,* 1 Redf. Surr. (N. Y.) 238; note, 31 Am. St. Rep. 691."

*Harrison's Appeal,* 48 Conn. 202: "A will may be valid as to some parts and· invalid as to others. * * * Fraud or undue influence in procuring one legacy does not invalidate other legacies."

*Florey's Executors v. Florey,* 24 Ala. 241, 248: , "It is in accordance with the dictates of reason, and the principles of natural justice, that fraud or undue importunity,

on the part of one legatee, should not affect the other legacies."

*Ogden v. Greenleaf,* 143 Mass. 349: "Had the conduct of Ogden been fraudulent, or had he been guilty of undue influence, the codicil would have been partially set aside only."

*Old Colony Trust Co. v. Bailey,* 202 Mass. 283, 289; "That, upon proper evidence, the will might not be found to be procured by fraud in part and to be good in other parts. That this may be so found seems to be generally held by the courts"—citing a number of cases.

*Morris v. Stokes,* 21 Ga. 552, 569: "And the jury, upon sufficient proof, may strike out his legacy and establish the balance of the will, so that a will may be good as to one party, and bad as to another."

*Palmer v. Bradley,* 142 Fed. 193, 198: "Therefore since it is the province of the court in a probate proceeding to determine whether or not the instrument propounded is the will of the alleged testator, it is obvious on principle and well settled by authority that the court may find that a part only of the instrument is the testator's will, or that it is operative as to a part only of the property which it assumes to dispose of, and may admit it to probate as to such part and reject the balance, or may limit the probate as to such property as the will is effectual to pass."

In the case of *Post v. Mason,* 91 N. Y. 539, 43 Am. Rep. 689, the court held that, not having raised the charge of fraud as to a part of the will, as might have been done, complainants could not raise it in a general chancery proceeding. In *Steadman v. Steadman,* 10 Sadler (Pa.) 539, 14 Atl. 406, the jury were told, " 'In the case before us, if, in your judgment, the evidence shows such to be the fact, you can find in favor of the defendant, except as to so much of the will as provides for' devises not alleged to have been procured by undue influence. Held, no error."

*Lilly v. Tobbein,* 103 Mo. 477: "Where a particular clause has been inserted in the will by fraud or forgery,

it may, in such suit, be rejected for the reason that it is no part of the will."

*Walker v. Irby,* 238 S. W. (Tex.) 884, a contest over the probate of a will: "The general holding 'is that, where the undue influence does not affect the whole will, but only a part, and that portion and the remainder are separable, only the part affected will be held void."

28 R. C. L. 359: "A will which is void as to a legatee who exercised undue influence is not necessarily void as to other legatees who did not exercise such influence, and one part of a will may be void because of undue influence and another part valid because not affected thereby."

28 R. C. L. 138: "When the probate of a will is contested on the ground of undue influence, one or more of the provisions of the will may be sustained as valid, while others are set aside. The whole will is not necessarily void because of undue influence, but will be left to the jury to determine what gifts or devises were obtained by such fraudulent influence, and such gifts or devises only will be declared void."

40 Cyc. 1149: "Where the fraud or undue influence does not affect the whole will, but only a part, and that portion and the remainder are separable, only the part affected will be held void."

40 Cyc. 1233: The court "may reject any provision which was procured by undue influence, or was inserted by fraud or mistake."

Innumerable authorities may be cited that, in a will, one out of several devises may be shown to be illegal; to be so uncertain as to be unintelligible; to be contrary to public policy; and many other causes appearing upon the face of the will may be such that the valid parts will be enforced in proceedings of probate and the invalid part rejected. As is stated in 40 Cyc. 1080: "It is a rule of general application that if a will is valid as to some of its provisions and invalid as to others, and the valid provisions can be separated from the invalid, and upheld without doing injustice to any of the beneficiaries

under the will, or defeating the general intent of the testator, the will must be sustained in so far as it is valid."

Again, at page 1081: "The rule has been applied where part of the will was invalid for uncertainty, or where it contained provisions void as against public policy, or in violation of statutes prohibiting the emancipation of slaves, or the unlawful suspension of the power of alienation, or regulating testamentary disposition of property for charitable uses, or in violation of the rule against perpetuities. So the rule has been applied in cases where some of the provisions of the will were void for undue influence, or as providing for an illegal accumulation of income."

Applying the foregoing rule, complete justice may be done and further litigation ended. Unless this case can be disposed of in this manner, and rightly so, we feel that for errors of law in the admission and rejection of testimony upon the trial (which related almost entirely to the competency of witnesses and to contestant's claim of fraud and undue influence) the verdict and judgment would have to be set aside in its entirety. Rather than do that and subject the parties and the innocent legatees to further burdensome litigation and expense, and in view of the fact that the sustained legacies are minor, and that three of them at least are sustainable in morals and affection, it is our conclusion that the verdict and judgment be affirmed as to the following legacies: $1,000 to William W. Koller, $300 to the Methodist Church, $50 to Cynthia Best, $50 to Mary Kahle, and $300 to Mary Bills; that the judgment be reversed as to the bequest to Ida Craig of the rest and residue of the estate; said bequest is set aside and the cause remanded to the district court, with directions to remand the case to the county court with directions that the rest and residue of the estate so bequeathed to Ida Craig be distributed according to the laws of inheritance.

AFFIRMED IN PART, AND REVERSED IN PART.

GOOD, J., dissents.

Note—See Wills, 41 L. R. A. n. s. 1126; 28 R. C. L. 359.