IN RE ESTATE OF NELLIE HOLLIS.

DWIGHT HOLLIS et al., Appellants, v. BESSIE LEE et al., Appellees.

No. 46385.

JANUARY 11, 1944.

REHEARING DENIED APRIL 7, 1944.

F. J. Lund, of Webster City, for appellants.

O. J. Henderson, of Webster City, for appellees.

GARFIELD, J.—The testatrix, Nellie Hollis, age about eighty-five, died on November 2, 1942. Her husband predeceased her by about nine months. There survived two daughters, Annie Varnell and Bessie Lee, two sons (Dwight and Marion Hollis) of a deceased son, George, and two sons (Leroy and Floyd Boynton) of a deceased daughter, Lottie. George died in 1910; Lottie, in 1907. Annie lived in Texas; the Boynton boys, in California; Bessie Lee, Dwight and Marion Hollis, in or near Webster City. Mrs. Hollis left a separate estate of $10,000—$6,000 in postal-savings certificates and bonds and $4,000 in bank deposits. Her will, dated June 15, 1942, gave a dollar each to

the contestants, her daughter Annie and grandsons Marion and Dwight Hollis; $100 to Mrs. Ethel McCollough; half the residue to her daughter Bessie, and the remaining half to her grandsons Leroy and Floyd Boynton. These last three are the proponents. Bessie was nominated executrix without bond.

The husband, Frank Hollis, left a will made in February 1938, which is not directly involved here. He left his wife his household goods, livestock, grain, and farm machinery (they lived on a farm until November 1940, when they moved to Webster City), and the use and income for life from the balance of his property. The remainder interest in his farm of about 190 acres he left in three equal parts to Annie, Bessie, and the Boynton boys, with the explanation that he had deeded forty acres to his son George and therefore George's sons, Dwight and Marion, did not share in the farm. The residue of his property was left in four equal parts to Annie, Bessie, the Boynton boys, and Dwight and Marion Hollis. The home and an undisclosed amount of money and securities passed under this residuary clause. The testatrix elected to take under her husband's will.

I. Since appellants' sole contention is that the case should have been submitted to the jury, we are required to review the evidence.

The will was prepared at testatrix' home by her attorney, Mr. Burnstedt. He, his partner, Mr. Hemingway, and her banker, Mr. Alexander, witnessed its due execution. None of the proponents was present and apparently knew nothing of its execution nor of its terms until after testatrix died.

Mr. Alexander identified a number of checks signed by the testatrix during 1942 and a number of small checks for expenditures drawn on testatrix' account and signed by Bessie Lee. He said Mrs. Hollis personally renewed a postal-savings certificate for $2,500 on September 1, 1942. She came to the bank and transacted her business about every Saturday. On August 1, 1942, at her suggestion the banker wrote and she signed a check transferring $1,200 from her checking account to her savings account.

Dwight Hollis lived just around the corner from his grandmother. He testified to friendly relations with his grandparents and that after his grandfather's death there was no sign

764

from his Aunt Bessie that he and his brother were too welcome in the grandmother's home. (Bessie had a home of her own but spent considerable time with her mother.) Marion Hollis lived on a near-by farm. He, his wife, and mother also testified to cordial relations between Dwight and Marion and their grandparents. The wife testified that she and Marion called to see the grandmother the evening before she died. Bessie said they were not wanted and could not come in but they went in anyway. This witness also testified that Bessie told Marion he was not going to get any more of the Hollis estate. This was in the grandfather's lifetime and apparently after his will had been made.

Mrs. Ted Frakes, wife of the tenant on the Hollis farm in 1941 and 1942, testified that Mrs. Hollis said "if things go on as they had been, they'd be in the poorhouse in two years." This amused the witness. Mr. and Mrs. Hollis always spoke well of George's two boys. Other witnesses so testified. Marion helped his grandparents and took them a good deal from the farm. Mrs. Hollis told her husband that George worked for the forty acres that were deeded him. She was a determined old lady and very unkind.

Henry Noffke, a neighbor who farmed the Hollis land six years, said Mr. and Mrs. Hollis used to quarrel over money matters. Mrs. Hollis said if they moved to town they would starve to death or go to the poorhouse. After they moved she wanted Frank to get an acreage, raise chickens and milk a cow so they would not starve. Other witnesses also testified to this. At that time they were both unable to work. (They both died of cancer.) Mrs. Hollis was high-tempered. Mrs. Noffke also testified to many of these matters. Mr. and Mrs. Hollis seemed to enjoy quarreling. Mrs. Hollis was clever and quick-witted. Marion Hollis took the grandparents food from the farm.

Olive Bateman, who lived next door, identified a writing witnessed by her and signed by Mrs. Hollis two days before she died, four and one-half months after the will was made, in which she gave Bessie her household goods and personal effects in recognition of the faithful services rendered by her. Miss Bateman further testified that Mr. and Mrs. Hollis quarreled much of the time they were together. Other witnesses so testified. After Mr. Hollis died, in February 1942, Mrs. Hollis seemed

pretty peaceful and calm. She was clever and a good joker. There was nothing abnormal about her for one of her age. Shortly before the will was made the daughter Annie visited her mother but objected to the bed and stayed only one night. Testatrix was very much worked up and said she was afraid of Annie—thought Annie might come back and harm her. She had pneumonia twice, once in the fall of 1941 and again in February 1942. After her husband died she lived alone in her house most of the time. Occasionally she walked to Bessie's home. Practically every Saturday she walked downtown. After Mr. Hollis died she never saw Dwight or Marion call on their grandmother. Until Frank's will was read, Mrs. Hollis thought he and Bessie were plotting to get her property.

Margaret Frakes was a practical nurse who helped care for Mr. and Mrs. Hollis when they were sick. She saw Mrs. Hollis about twice a week from the death of her husband in February to October 1942, when she became critically ill. She testified Mrs. Hollis quarreled continually with her husband and Bessie; she would yell and scream and call Mr. Hollis profane and vile names; she would say her husband and Bessie were plotting against her, she would have nothing to live on, and Bessie and her father were trying to poison her; she was jealous of other women and accused her husband and a farm wife of doing things they ought not to do; she wanted him to get an acreage so she could raise chickens and have something to live on. He was then not able to work. Mrs. Hollis once threatened to kill her husband. Mrs. Hollis wanted to give the witness her electric refrigerator but Bessie said she could not. During Mr. Hollis' last sickness his wife would hide his medicine and pour it in the stool, said they could not afford the medicine, that he would throw it up and was going to die anyway. Testatrix would not let them use good comforters to cover her husband. Bessie told her mother Marion and Dwight did not come to see her, that they sent cheap flowers to their grandfather's funeral, and she had no use for them. Before Mr. Hollis died he asked to have a certain hymn sung at his funeral. His wife said the song would not be sung. The hymn was, however, sung at the funeral. Before he died, the father asked the witness to call his attorney,

Mr. Burnstedt, when the end came. Testatrix first refused to have Burnstedt on the place. Later, she got so she liked him.

On the day before the will was made, Mrs. Hollis sent for the witness. She was walking the floor—crying and screaming—and said Bessie had told her Annie, Marion, and Dwight were going to get her money, put her in the "crazy house" and appoint a guardian over her. (Marion and Dwight denied having any such intention; Annie did not attend the trial.) The witness told her no one "would put her in the crazy house or harm her. She [testatrix] said they were." After Annie's visit, Bessie told her mother Annie was there "for no good, she better make a will and get her business fixed up because the boys would swear she was crazy and they were going to appoint a guardian over her and put her in an asylum." Many times she heard Bessie tell her mother she was crazy. In October, Bessie ordered the witness not to let Marion and Dwight in the house but she said she would not do that.

Asked whether Mrs. Hollis' mental condition was sound or unsound, Margaret Frakes answered, "I would say * * * at many times her mind was impaired." The day before the will was made she was in one of those spells when she would call her mind impaired.

On cross-examination Margaret said Mrs. Hollis was better mentally during the summer of 1942; after her mother died Bessie expressed surprise at the contents of the will and did not know what it provided; never heard Bessie ask her mother to make a will in her favor but she did tell her Dwight and Marion did not deserve anything; after Annie's visit and before the will was made, Bessie wanted her mother to go to Texas to live with Annie but she would not go; Bessie took good care of her mother; when Mr. Hollis' bank box was opened, after he died, testatrix identified her bonds, told their amount and when the interest was due; she was strong-minded in money matters. The witness did not know whether testatrix was sane or insane on the day the will was made; her mind was affected at times so that she did not know what she was doing; she knew what property she had; she understood she had the life use of the farm; she knew about her two daughters and her grandchildren, was under no delusions as to them. Asked whether testatrix did

not know where she wanted her property to go, the witness said she did not know. She testified testatrix' angry or hysterical spells would "last sometimes ten minutes and then quiet down a little—maybe she would then think of something else, sometimes it would be a half hour."

Ethel McCollough lived in the Hollis home as a girl. After they moved to town she spent one or two days a week in the home. She testified to many of the matters that Margaret Frakes did, although in less detail. Asked for an opinion as to testatrix' mentality, she said: "At times I really think she was mentally impaired. Q. What makes you think that? A. She would go into those spells of quarreling with Grandpa and her eyes would get so glassy and her cheeks would get so pink, and she would be just terrible mad."

On cross-examination Mrs. McCollough said Mrs. Hollis bought her own groceries; there were times she knew what she was doing; testatrix said Bessie had told her to fix her property up and get her business in order; witness advised her to do as she liked and not to please any of them; testatrix spoke frequently about her daughters and grandchildren; frequently wrote the Boynton boys until shortly before her death; she knew about her family relationship. Asked whether testatrix could make up her mind where she wanted her property to go, Mrs. McCollough said: "I don't know. If I wanted someone to divide anything, I wouldn't have wanted her to do it." She also testified: "My theory of her being mentally impaired were the violent quarrels she and Grandpa would get in over Bess and Grandpa going to poison her and by her thinking they were trying to get her out of the way." She also said when Mrs. Hollis made up her mind, no one, including Bessie, could change it; she never heard Bessie try to get anything out of her mother.

Mrs. McCollough also testified that Mrs. Hollis said Bessie had told her Annie and the boys were going to put a guardian over her and put her in the insane asylum. The witness assured her they would not think of such a thing. This witness said she was disappointed that her legacy was only $100; Mrs. Hollis had promised her $1,000 and also the electric refrigerator.

Mrs. Hollis wrote three affectionate letters to Annie, dated October 17, 1940, and April 14th and May 3, 1942. A long letter

from Bessie to Annie dated February 3, 1942, after the father's death, said in part:

"Grandma has sure been a D.... if ever their was one— no one could handle her but me and I am telling you she is the (worlds worst) at times her mind was clear gone & again she was as smart as could possible be."

This letter, being a declaration or admission by one of several legatees, would not be admissible had proper objection been made, because it would operate to the prejudice of other legatees. Wackman v. Wiegold, 202 Iowa 1391, 1394, 212 N. W. 122, and cases cited; In re Estate of Green, 227 Iowa 702, 706, 288 N. W. 881; 68 C. J. 1009, section 783.

There was also testimony that testatrix denied having signed the deed to the forty acres to George in 1909. Different witnesses identified her signature to the deed. Testatrix wrote Annie that Mr. Burnstedt had all the power over her husband's estate. In fact, he had no authority except as attorney for the estate.

While there was other testimony, we have summarized much of it.

■ II. The right to dispose of property by will is one which the law is slow to deny. No mere weakening of the mental powers—no mere impairment of the faculties—will invalidate a will so long as the maker has mind enough to know in a general way the natural objects of his bounty, the nature and extent of his estate, and the disposition he wishes to make of it. It is not necessary that he be competent to make contracts or transact business generally. Perkins v. Perkins, 116 Iowa 253, 259, 90 N. W. 55, 57; In re Estate of Heller, 233 Iowa 1356, 1365, 11 N. W. 2d 586, 591, and cases cited. Applying this test, we are agreed the evidence, viewed in the light most favorable to appellants, is insufficient to warrant a finding of testamentary incapacity at the time the will was made.

There was no expert testimony. No one claims there was any permanent unsoundness or any progressive mental disease such as senile dementia. It fully appears that testatrix was competent to and did look after her business affairs. The most that can be claimed is that *at times* her mind was *impaired*. We

have said time and again that testamentary incapacity does not result from mere impairment of the faculties. Even Margaret Frakes and Mrs. McCollough admitted Mrs. Hollis fully knew who were the natural objects of her bounty and what property she had. Neither witness would say she did not know what disposition she wanted to make of her property. A jury verdict of testamentary incapacity would necessarily be based, at least in part, on conjecture. In re Estate of Sinift, 233 Iowa 800, 810, 10 N. W. 2d 550, 555, and cases cited.

III. Nor do we think a finding would be warranted that the will was the result of the undue influence of Bessie Lee. Undue influence, although of course it may be proven by circumstantial evidence, must be such as to substitute the will of the person exercising it for that of the testator, thereby making the writing express the purpose and intent of such person, not of the testator. It must be equivalent to moral coercion. It must operate at the very time the will is made and dominate and control its making. It is not established by proof of opportunity and disposition to exercise it. Importunity, request, and persuasion that do not control the will are not enough. In re Will of Richardson, 199 Iowa 1320, 1327, 202 N. W. 114; In re Estate of Mott, 200 Iowa 948, 949, 205 N. W. 770; In re Estate of Brooks, 229 Iowa 485, 493, 294 N. W. 735, and cases cited. In support of our conclusion, see Campbell v. Hale, 233 Iowa 264, 6 N. W. 2d 128.

IV. Finally, it is contended the court should have submitted the issue of fraud in the procurement of the will. In appellants' excellent brief no Iowa case is cited that sustains this contention. Principal basis for the argument is the testimony of Margaret Frakes that after Annie's visit she heard Mrs. Lee tell her mother that Annie was there for no good, she better make a will and get her business fixed up because the boys would swear she was crazy and they were going to appoint a guardian over her and put her in an asylum. There is also testimony by Margaret Frakes and Mrs. McCollough that testatrix said Mrs. Lee had made about the same statement to her. This last testimony is not substantive proof of what Bessie told her mother, but is to be considered as showing Mrs. Hollis' state of mind and her susceptibility to influence. In re Estate of Rogers, 229

Iowa 781, 788, 295 N. W. 103, 106, and cases cited; In re Estate of ·Wientjes, 206 Iowa 1314, 1316, 1317, 221 N. W. 935; 28 R. C. L. 153, section 107; 68 C. J. 1004, section 774.

Like many other courts, we have been slow to recognize fraud, as distinguished from undue influence, as a ground for contesting a will. James v. Fairall, 168 Iowa 427, 441, 148 N. W. 1029; Worth v. Pierson, 208 Iowa 353, 360, 223 N. W. 752. Some well considered cases, however, recognize the distinction between fraud and undue influence. In general, fraud deceives the testator's mind; undue influence overpowers it—usually by a course of conduct. In most of the cases, fraud is but a part of a systematic attempt to deceive *and* overpower the testator and is treated as undue influence. See, on this subject, 1 Page on Wills, Lifetime Ed., chapter 9; In re Estate of Newhall, 190 Cal. 709, 214 P. 231, 28 A. L. R. 778, and annotation 787; Gockel v. Gockel, Mo., 66 S. W. 2d 867, 92 A. L. R. 784, and annotation 790. .

Conceding, without deciding (as we did in Worth v. Pierson, supra), that a will may be set aside for fraud in the absence of undue influence, we think contestants failed to make a case for the jury on this issue. Fraud consists of willfully false statements of fact by a beneficiary to a testator, which are made in bad faith or with intent to deceive testator, which do deceive him and induce him to make a will he would not otherwise have made. 1 Page on Wills, Lifetime Ed., section 179.

The only evidence bearing on the falsity of what it is claimed Bessie told her mother is that Dwight and Marion denied any thought of instituting guardianship proceedings against testatrix. There is no proof that Annie had not threatened to do all it is claimed Bessie charged against her. The falsity of the statement is therefore not proven.

Further,·the Boynton boys, who received as much under the will as Bessie, are not charged with any misconduct. For all the evidence shows, their legacy expresses the true will of the testatrix. There is considerable authority that fraud will cause an entire will to be set aside only if it affects the entire instrument and the setting aside will not prejudice innocent beneficiaries. While one should not be permitted to profit from his own wrong, others who are innocent should not suffer therefrom.

"A false and fraudulent statement by one of two beneficiaries under a will makes the will void as to the beneficiary who is guilty of the fraud, but not as to the beneficiary who is innocent of it." 1 Page on Wills, Lifetime Ed., section 181.

See, also, In re Koller's Estate, 116 Neb. 764, 219 N. W. 4, and cases cited. No claim to any such partial relief has been made either here or below.

Further, a finding would not be justified that the alleged statement induced this will and that it would not otherwise have been made. In considering both the claimed fraud and undue influence, it should be remembered that the will was prepared by Mr. Burnstedt. Mrs. Lee apparently had nothing to do with its preparation and knew nothing of it until after her mother died. So far as shown, testatrix never expressed dissatisfaction with it. Before the will was made, both Margaret Frakes and Mrs. McCollough assured Mrs. Hollis no one intended to put her in an asylum or have a guardian appointed for her. Mrs. McCollough testified, in effect, that she, more than anyone else, was able to influence testatrix. Mrs. Lee did not ask her mother to make a will in her favor.

It is apparent something happened, for which Bessie was not responsible, at the time of Annie's visit to her mother, to cause some estrangement between the two. Annie came from Texas for the visit, stayed one night with her mother, complained of the bed, left before breakfast, never to return. The evidence shows no communication thereafter between the mother and Annie. The mother was worked up and expressed fear that Annie would return and harm her. Between Annie's visit and the making of the will Bessie suggested that her mother go to stay with Annie, who kept a convalescent home. The mother would not listen to the suggestion.

As for Dwight and Marion, they seldom visited their grandmother after their grandfather died and did not help care for her. This burden fell largely upon Bessie, who, with a family of her own, left her home in Minnesota to help take care of her parents. No one says she did not do a good job. The Boynton boys' mother died when they were small and one or both of them lived with their grandparents for extended periods. The will, therefore, is not so unnatural as might appear.

Appellants' motions to strike appellees' second amended abstract and part of appellees' first amended abstract are overruled. However, we have not considered the testimony of J. E. Burnstedt which appellees offered after the case was decided. In view of appellants' denials of appellees' amended abstracts, we have treated the transcript of the testimony as the true record. —Affirmed.

All JUSTICES concur.