IN RE ESTATE OF JANE MARSDEN.
WILLIAM T. MARSDEN AND OTHERS v. VALERA
SPENCER PUCK.[1]

March 17, 1944.

Nos. 33,605, 33,613.

[1]Reported in 13 N. W. (2d) 765.

2

*V. V. Lindgren, B. D. Grogan,* and *Farmer & Tighe,* for Valera Spencer Puck, proponent.

*Kyle & Kyle* and *William Stradtmann,* for William T. Marsden, Guy Marsden, Lee Marsden, Maud Spencer, and Charlotte Cary, contestants.

STREISSGUTH, JUSTICE.

. In this contest involving the last will of Jane Marsden, dated May 6, 1940, and an instrument revoking all her wills, dated March 8, 1941, a jury answered four special interrogatories submitted to it as follows:

"Question No. 1: Was the testatrix, Jane Marsden, of sound and disposing mind and memory at the time of the execution of the will, dated May 6, 1940?

"Answer: Yes.

"Question No. 2: Was the execution of said will procured by undue influence?

"Answer: Yes.

"Question No. 3: Was Jane Marsden of sound and disposing mind and memory at the time of the execution of the revocation on the 8th day of March 1941?

"Answer: Yes.

"Question No. 4: Was the revocation dated March 8, 1941, obtained by undue influence?

"Answer: Yes."

The trial court adopted the jury's findings and ordered judgment denying the petition for probate of the will, reversing and setting aside an order of the probate court allowing the will, and further denying a petition for general administration of Jane Marsden's estate, she having executed several wills antedating the one in contest. Motions by the opposing parties for amendment of the findings were uniformly denied, judgment was entered, and these appeals followed.

Only fact issues are presented by the several appeals. Valera Spencer Puck, the proponent, hereinafter called Valera, challenges the sufficiency of the evidence to support the affirmative answer to question No. 2, the trial court's action in adopting such answer, and its action in refusing her motions for amended findings negativing undue influence in the execution of the will. She likewise challenges the affirmative answer to question No. 3 and the court's action in adopting the same and in refusing to amend its findings so to establish mental incompetency on March 8, 1941, the date of the instrument revoking the wills. Contestants, on the other hand, challenge the sufficiency of the evidence to support the affirmative answer to question No. 4 and the court's action in adopting said answer and in refusing to amend its findings so as to negative undue influence in connection with the revocation.

Tom Marsden, a resident of Watonwan county, died intestate in August 1934, leaving an estate valued in excess of $100,000. Surviving him were his widow, Jane Marsden, whose will is here attacked, and his five children, Maud Spencer, Charlotte Cary, Guy Marsden, Lee Marsden, and William Marsden. After probate of his estate, Tom Marsden's property was divided by mutual agreement between the heirs under a plan whereby the widow received 422 acres of land, plus a share of his personal property.

Mrs. Marsden lived to be 75 years of age. She died on March 16, 1941. In the interim between her husband's and her own death, she had acquired a home in Mankato and some additional personal property. The total value of her estate at the time of her death was somewhat over $25,000.

Valera is a daughter of Maud Spencer and a granddaughter of Tom and Jane Marsden. She had lived with her grandparents during her childhood days while attending grade school, and, after completing her high school course, had returned to their home to live. Later she married and had one son. She was divorced from her first husband in 1933 and in 1940 married Lorraine Puck, her present husband.

Shortly after her divorce, Valera again returned to live at the home of her grandmother, which, except for short intervals, she made her own home continuously until Mrs. Marsden's death in 1941. Their happiness during these years belied the adage that age and youth cannot live together. During 1935 and 1936, Mrs. Marsden and Valera traveled and vacationed extensively and, with their traveling, their intimacy grew closer than ever. Valera owned and drove the car in which they traveled, but the grandmother paid all expenses. The car was eventually traded in for a new one, to which Valera took title, though Mrs. Marsden paid the balance of the purchase price on the trade. A joint bank account was established and Valera given carte blanche so far as disbursements therefrom were concerned.

Mrs. Marsden enjoyed these new experiences, notwithstanding that her estate was being seriously depleted thereby; but, in 1935, after about 18 months of nomadic living, she decided to settle down to a normal life again and purchased a home in Mankato, where she and Valera established themselves in 1936 and where they continued to live until 1937. During that period and in September 1936, Mrs. Marsden executed her first in a series of four wills, wherein she devised her new home to Valera "in appreciation of the fact that she has resided with me ever since the death of my husband, has assisted me in many ways in household duties and business affairs and has been most kind and considerate." Her other real estate was devised to her children in equal shares, and the residue of her estate bequeathed to her two daughters in equal shares.

The children of Mrs. Marsden viewed this growing intimacy between Valera and their mother with alarm and became especially solicitous about the possible depletion of their mother's estate by "riotous living." In July 1937, they decided to intervene. The mother was prevailed upon to petition for the appointment of a guardian of her estate, and her daughter Maud Spencer was appointed as such. Contemporaneously, a second will, dated July 15, 1937, was executed by Mrs. Marsden, dividing her estate equally among her children. In this will specific reference to the provision for Valera in the former will was made in these significant words, which testify to a surrender by Mrs. Marsden in the interest of family harmony: "I make no provision for her [Valera] in this my Last Will and Testament for the reason that I believe that it will be best for all concerned that no provision be made for her."

Following appointment of the guardian, the Mankato home was abandoned, and Mrs. Marsden was farmed out to her children Charlotte, Maud, and Guy, in turn, for a fee of $60 per month. But the arrangement proved irksome to her, and in June 1938 she petitioned the probate court for restoration to capacity. Her petition was rejected, but shortly afterward the Mankato home was reestablished, and, at Mrs. Marsden's request, Valera again came to live with her.

On August 21, 1939, Mrs. Marsden filed a second petition for restoration to capacity and the removal of Mrs. Spencer as guardian. The petition was denied, but Mrs. Spencer was relieved of the guardianship and E. C. Wingen, a banker of Amboy, and a friend of the Puck family, appointed in her stead.

After a short interval and on December 23, 1939, Mrs. Marsden executed her third will, again devising to Valera the home at Mankato and, in addition, 160 acres of farm land, "because she is the only one that has been good and kind to me, and the only one to see that I had some pleasure in life, to live and stay with me, so I would not be left alone." Valera was also given a cash legacy of $500, while her mother, Maud Spencer, the former guardian, was in effect disinherited by a bequest giving her eight dollars. The rest

of the property was divided equally between the remaining four children, and Wingen was named executor.

Notwithstanding the pendency of guardianship proceedings, it is conceded that during all this period Mrs. Marsden possessed testamentary capacity. The fact of guardianship would in no event be conclusive on the issues of mental capacity or undue influence. Champ v. Brown, 197 Minn. 49, 266 N. W. 94; Schultz v. Oldenburg, 202 Minn. 237, 277 N. W. 918; In re Hollis' Estate, 234 Iowa —, 12 N. W. (2d) 576; 1 Page, Wills (Perm. ed.) § 153; Schouler, Wills (3 ed.) p. 85, § 81. Nor on this appeal do the heirs at law challenge the finding of the jury that she possessed testamentary capacity on May 6, 1940, the date of her last will. The only question in respect to that will is whether it was procured by undue influence on the part of Valera. The disposition of that question will require further details.

Prior to May 1, 1940, Mrs. Marsden had numerous conferences with the judge of probate and with Albert Running, an attorney at St. James, concerning her old wills and the making of a new one. On each of these occasions she was accompanied by Agnes Woods, an aunt of Valera's first husband, who served as Mrs. Marsden's housekeeper. Running located the 1937 will for her in a bank at St. James and mailed it to the judge of probate, who in turn delivered it and the 1939 will, filed with him, to Mrs. Marsden.

On May 1, 1940, Mrs. Marsden consulted Emmett Tighe of the law firm of Farmer & Tighe of St. James, who had previously done legal business for her husband. She told him she was under guardianship, discussed her children and her husband's affairs, and the division of his property, and stated that she wanted to make a new will, explaining what changes she proposed to make therein, and that she wanted to leave the bulk of her property to Valera. Later in the same day she consulted her physician, Dr. W. J. McCarthy of Madelia, asked him to verify her competency to make a will, and discussed with him some of her personal affairs, favorably mentioning Valera and Gayle Marsden, another grandchild, two of the beneficiaries specifically mentioned in her later will. Dr. McCarthy

advised her that she was competent to make a will and, when asked to recommend an attorney, advised her to see Mr. Tighe, whom she had already consulted.

Shortly afterward Mrs. Marsden again went to St. James to see Mr. Tighe, being taken there by Mrs. Woods and Mrs. Jul Puck, mother-in-law of Valera. Mrs. Woods was present at the conference with Mr. Tighe, during which Mrs. Marsden discussed the terms of her proposed new will at length and instructed him to prepare a will containing the provisions of the will here contested. Mr. Tighe was reluctant to prepare the will without an associate counsel, and, after some discussion, it was agreed that B. D. Grogan, an attorney at Mankato, should be asked to assist. Accordingly, Tighe and Grogan met at Mankato and made elaborate arrangements for the execution and publication on May 6, 1940, of the will, inviting Dr. McCarthy of Madelia and Dr. Charles Koenigsberger of Mankato, as well as some neighbors and friends of Valera and Mrs. Marsden, to be present. Actually, there were between 15 and 20 people present in the Marsden home that evening when the will was executed. The preliminaries of dictating the will to a stenographer and its preparation on a typewriter had been previously performed, but the assembled guests were present during a discussion of the terms of the will and at its final execution.

The will as finally prepared was carefully read and explained to Mrs. Marsden in the presence of the assembled guests, and then formally published and executed by her. The two physicians, as well as lay members of the audience, all testified as to her mental capacity at the time, the meticulous care taken to insure that she should understand the terms of the will, and the complete absence of fraud and undue influence.

The terms of the will bear out the statement that it was carefully prepared. After the usual directions as to debts and funeral expenses, there was a specific devise of the Mankato home and its contents to Valera, followed by a devise of the same 160 acres which had been devised to her by the 1939 will. A cash bequest of $500 was made to Gayle Marsden, a grandson, and cash bequests of $1,000 to

each of Mrs. Marsden's five children. The residue of the estate was devised and bequeathed to Valera. Mrs. Woods, the housekeeper and aunt of Valera's first husband, was named executrix.

The subject of undue influence is not new to this court. Its underlying principles have become settled by a long and uniform line of decisions, yet some of these principles may bear repetition.

■ Undue influence must be such as to substitute the will of the person exercising it for that of the testator,· thereby making the written result express the purpose and intent of such person, not those of the testator. It must be equivalent to moral coercion or constraint overpowering the will of the testator. *It must operate at the very time the will is made* and dominate and control its making. 6 Dunnell, Dig. & Supp. § 10238; Schmidt v. Schmidt, 47 Minn. 451, 50 N. W. 598; In re Estate of Mazanec, 204 Minn. 406, 283 N. W. 745; In re Estate of Geske, 211 Minn. 447, 1 N. W. (2d) 423; Buck v. Buck, 122 Minn. 463, 142 N. W. 729; In re Hollis' Estate, 234 Iowa —, 12 N. W. (2d) 576.

■ Evidence to prove subordination of the will of testator to that of another must necessarily take a very wide range and, from the nature of the issue, will generally be mainly circumstantial. In re Will of Nelson, 39 Minn. 204, 39 N. W. 143. Any evidence which shows an opportunity and disposition to exert undue influence, the degree of susceptibility of testator to undue influence, or a result which indicates that undue influence has been exerted, is admissible, 6 Dunnell, Dig. & Supp. § 10239; 2 Page, Wills (Perm. ed.) § 812; but, after all such evidence is received, it must be carefully sifted to determine whether there is any substantial evidence to establish undue influence *at the time when the will was made.* "The circumstances relied on to show it must be such as, taken all together, point unmistakably to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter, and not of the former; mere ground of conjecture or guess is not enough." In re Will of Nelson, 39 Minn. 204, 206, 39 N. W. 143, 144; In re Estate of Jenks, 164 Minn. 377, 383, 205 N. W. 271, 273.

Evidence which raises merely a suspicion and shows no more than a motive for exerting and an opportunity to exert undue influence is insufficient proof thereof, though coupled with proof of inequality in the terms of the will. 6 Dunnell, Dig. & Supp. § 10240; In re Estate of Mazanec, 204 Minn. 406, 283 N. W. 745; Buck v. Buck, 122 Minn. 463, 142 N. W. 729; 2 Page, Wills (Perm. ed.) §§ 815, 817, 842. As in the trial of any issue of fact, "the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." Galloway v. United States, 319 U. S. 372, 395, 63 S. Ct. 1077, 1089, 87 L. ed. 1458; A. T. & S. F. Ry. Co. v. Toops, 281 U. S. 351, 50 S. Ct. 281, 74 L. ed. 896.

That Valera Puck had the opportunity, by methods fair or foul, to influence her grandmother in the making of a will is evident here; but, granting opportunity, the existence and character of any influence actually exercised rests entirely on suspicion and falls far short of the clear and persuasive proof required in such cases. In re Estate of Mazanec, *supra*. She was admittedly not present when the will was formally executed, nor did she accompany her grandmother on any of the several trips to the offices of Mr. Tighe and Dr. McCarthy. Nor was any proof offered that Valera ever discussed the subject of a will with her grandmother.

Much is made of the fact that, in conversations with Valera, her brother stated that "she might get something * * * from her grandmother," and that she replied, "I'll take care of that"; but, construed most favorably for contestants, her statement shows merely a disposition and perhaps a motive to exercise influence, which, considered alone, have never been deemed sufficient to prove undue influence. There must be some evidence that it was in fact exercised. 6 Dunnell, Dig. & Supp. § 10240; In re Hollis' Estate, 234 Iowa —, 12 N. W. (2d) 576, *supra*. Declarations by a legatee as to his power to influence testator have frequently been held not to be even material or relevant to the issue. 2 Page, Wills (Perm. ed.) § 855; *cf.* §§ 851, 852.

■ It is also urged that the will is unfair in that under its terms Valera will receive $20,000 or more in property, while the five children of Mrs. Marsden will receive only $1,000 each. This argument ignores the fact that Valera was not a stranger but the natural granddaughter of Mrs. Marsden, who had acted *in loco parentis* from Valera's childhood, and the further and even more persuasive fact that during Mrs. Marsden's widowhood Valera was her constant attendant, comrade, and companion to the practical exclusion of the contestants, her children. Considering the relationship and intimacy existing between the two, the will is readily explainable. There was nothing unnatural about Mrs. Marsden's preferring her granddaughter to her own children, who had shown but little interest in her welfare except to preserve her estate for themselves.

Fate makes our relatives, choice our friends; yet there is nothing more solid than real friendship cemented with common blood. Even sons and daughters have no first mortgage upon the estate of their parents, certainly not when even such considerations as love and affection are wanting.

A will does not, as a rule, show upon its face whether it is fair, just, and reasonable, or the reverse. As bearing upon its justice or injustice, it is necessary to know who were testator's heirs and next of kin and the degree of relationship between them and testator; and to have the same information with reference to the beneficiaries under the will. Even a will which discriminates between persons who are equally related to testator, or which practically disinherits children in favor of a person who is more remotely related to testator, cannot be said to be unjust or unnatural as a matter of law, since this question depends upon a number of facts, including the conduct toward testator of the heirs, next of kin, and beneficiaries, and the testator's feelings for them, as well as the financial situation of the respective parties. 2 Page, Wills (Perm. ed.) §§ 859, 860.

■ Evidence of affection or intimacy as between persons related by blood or marriage negatives rather than proves undue in-

fluence. 2 Page, Wills (Perm. ed.) §§ 820, 825, 838, 860. The same principles that apply to the relationship of parent and child should apply to such a one as existed here between a grandmother acting as a *de facto* parent and her grandchild. 2 Page, Wills (Perm. ed.) § 821.

No presumption of undue influence arises from the fact that a will does not distribute the testator's property equally among the natural objects of his bounty. 2 Page, Wills (Perm. ed.) §§ 821, 842, 858. As said in In re Estate of Mazanec, 204 Minn. 406, 412, 283 N. W. 745, 748: "Mere inequality, however great, in the distribution of the property among the children or relatives, is no evidence of undue influence, nor is it made such by evidence of an impaired mind."

■ The dramatic performance attending the execution of the 1940 will was uncommon, to say the least, but was clearly prompted by a desire on the part of Mrs. Marsden's attorneys to satisfy a court and jury, in case of an attack upon the will as anticipated, not only of the fact of testatrix's mental competency, but also of the complete absence of undue influence. While contestants assert that the publicity attending the will's publication was evidence of undue influence on the part of Valera and her friends, we cannot so construe this final act in the sequence of events beginning with Mrs. Marsden's first visits to Dr. McCarthy and Mr. Tighe. If, as is frequently held, secrecy and surreptitious circumstances surrounding the execution of a will are evidence of undue influence, how, we ask, can the other extreme, exemplified here, have the same effect? We hold that the circumstances surrounding the publication of the will, though properly shown, negative rather than establish undue influence. See 2 Page, Wills (Perm. ed.) §§ 831, 836. They prove convincingly that in preparation for the execution of the will Mrs. Marsden sought independent advice from both her physician and the attorneys recommended to her; that the chief beneficiary took no part in the preliminaries or in the final drafting and execution; and, finally, that, out of an abundance of caution and in anticipa-

tion of trouble, testatrix and her attorneys went to extremes to avoid any charge of unfair play.

Our attention is directed to the fact that neither Mr. Tighe nor Mr. Grogan took the witness stand in support of the will. We feel that they would have better served the interests of testatrix, who employed them, by becoming witnesses instead of attorneys for proponent. Aided by the testimony of these attorneys, the jury might have been able to remove any doubt from its mind on the issues left to it for decision. However, not having taken the stand, their conduct is not subject to the censure meted out in In re Estate of Stephens, 207 Minn. 597, 293 N. W. 90, to an attorney who assumed the dual role of witness and attorney and gave the controlling testimony in support of a will.

█ Hobbes has said: "No discourse whatsoever can end in absolute knowledge of fact." In this we concur, adding that in no case can undue influence *vel non* upon a deceased testator's mind be demonstrated as a geometrical theorem. Suffice it, then, to say that we have examined the record in the light of the numerous "incidents and acts" enumerated by contestants' counsel in their brief as justifying the finding of undue influence, but have found none that rises to the dignity of proof or above the stature of speculation and suspicion. On the other hand, the record convincingly establishes that every possible precaution was taken by reputable physicians and lawyers to insure that Mrs. Marsden's will of May 6, 1940, was the free, uninfluenced, and rational expression of her testamentary wishes; and, in our opinion, that their objective was reached, beyond peradventure.

A verdict, though concurred in and adopted by a trial court in its findings, must be set aside and judgment entered to the contrary where there is no evidence reasonably sustaining the verdict or finding and no probability of a second trial supplying the deficiency in proof. This makes it our duty to reverse the judgment below so far as it repudiates the will of May 6, 1940, unless we also find that the revocation of wills executed by Mrs. Marsden on March 8, 1941, is equally immune from attack.

 In direct contrast to the facts surrounding the execution of the will of May 6, 1940, are those leading up to and culminating in the revocation of the prior wills. As to that will, Mrs. Marsden planned every detail herself while in good physical and mental condition, acting deliberately and taking every possible precaution that no suspicion should attach to her acts. As to its revocation, the initiative, the choice of attorneys, the selection of time and place, were all assumed by her children, who waited until their mother was on her deathbed to take action.

In January 1941, the children still viewing with jealousy the fact that Mr. Wingen, a friend of Valera's rather than one of their own number, was acting as their mother's guardian, employed an attorney named Smith to make an investigation of the guardianship and to prepare a petition for Wingen's removal from his trust. Upon a petition so prepared by Smith, a hearing was set for March 6, 1941, on which day all of the children were present with their attorney. Mrs. Marsden, however, had become very ill on March 1, and, on the day of the hearing, was at a hospital. The hospital charts recorded her condition as "confused, irrational."

With the mother in this condition, and without invitation, Percy Spencer, Valera's father, visited Mrs. Marsden and discussed with her the distribution of her property. To quote from the summary in contestants' own statement of facts:

"* * * she expressed some concern about her recovery. She expressed some opinions in regard to the distribution of her property. She said that she wanted 'everything just like pa had it.' That she did not like wills. Mr. Spencer told her that he would have Mr. Smith, the children's attorney, stop in to see her. She approved. She was unable to call an attorney herself or to go to an attorney's office. After Mr. Spencer left the hospital he contacted Mr. Smith at the Burton Hotel. He was in conference with the Marsden children on matters pertaining to the guardianship. Mr. Spencer told him that Jane Marsden was interested in taking some action in regard to the disposal of her property. Thereupon Mrs. Spencer and Mr. Smith went to the hospital and called on Jane Marsden.

Mr. Smith was introduced to her and shook hands with her. He had some conversation with her. He spent about thirty minutes with her."

The net result was that Smith told her that he would prepare the necessary paper to "cancel" her will.

Smith then returned to the children and made his report to them. He produced a petition for general administration of Mrs. Marsden's estate. It recited that Mrs. Marsden had *"died intestate* at Mankato" and was complete in every other detail except the date of death, which event had not yet occurred, and the name of the administrator, which was supplied by the assembled heirs after a vote by acclamation. Achilles, who though well-nigh invulnerable never went into battle without being fully armed, could not have acted more forehandedly than Smith did on this occasion.

The proposed administrator having been agreed upon, his name was inserted in the petition for administration, and Smith was dispatched to St. Paul to prepare the instrument of revocation. Before leaving he gave instructions as to witnesses and other details, which he confirmed by letter the following day, enclosing also a formal revocation for Mrs. Marsden to execute.

On March 8, Mrs. Spencer, Mrs. Cary, and Lee Marsden, accompanied by two witnesses selected by Lee and brought from Watonwan county for the occasion, went to the hospital, and the revocation prepared by Smith was then and there signed. The attending physician was not present, nor was he consulted as to Mrs. Marsden's condition, nor was the nurse in charge present. Mrs. Marsden was no longer able to write her own name, and signed by mark the instrument submitted to her.

Our disposition of the issue of undue influence will make it unnecessary for us to determine the sufficiency of the evidence to sustain the finding that Mrs. Marsden was competent at the time she signed the revocation by mark; but, even conceding that she was competent at the time, as the jury found on conflicting evidence, the issue of undue influence was a distinct one, in disposing of which the jury had a right to consider physical, as well as mental

weakness, though not amounting to actual testamentary incapacity.

A further discussion of the evidence relating to the revocation can be of no benefit to anyone except to serve as an object lesson on how and when not to attempt to get a will revoked. The revocation here is so saturated with undue influence that it must sink of its own weight in the sea of justice even without the additional impetus supplied by the "irrational" mind of its signer. The burden of establishing undue influence which the law imposed upon the proponents of the revoked will (2 Page, Wills [Perm. ed.] § 871) has been fully met.

Upon the appeal of Valera Spencer Puck, the judgment of the district court is reversed with directions to affirm the order of the probate court admitting to probate the last will and testament of Jane Marsden dated May 6, 1940, and denying the petition for general administration of her estate. As to the issues raised by the appeal of the contestants, the judgment is affirmed.

So ordered.