# IN THE MATTER OF THE ESTATE OF PETRONELLA OLSON v. ANDREW JOHNSON.[1]

January 21, 1921.

No. 22,109.

**Will—mental capacity of testatrix—subject of delusions.**

1. So long as the understanding and reason are so far unclouded that a testator has sufficient intelligence to be able to transact ordinary business, a court is not bound to conclude that he did not have sufficient mental capacity to make a will because he was the victim of delusions.

**Same—undue influence—evidence.**

2. The evidence sustains findings that testatrix was mentally capable of making the will involved in this appeal and that its execution was not procured by undue influence.

**Admissibility of evidence.**

3. There was no error in the rulings on the admission of evidence.

Frank O. Tidholm petitioned the probate court for Hennepin county for the allowance of the last will and testament of Petronella Olson, deceased. Andrew Johnson filed objections to the allowance of the will. From the order of the probate court, Dahl, J., admitting the will to probate, contestant appealed to the district court for that county. The appeal was heard before Jelley, J., who made findings and affirmed the order of the probate court. From an order denying his motion to amend the findings or for a new trial, contestant appealed. Affirmed.

*John A. Nordin* and *W. M. Babcock,* for appellant.

*G. A. Petri,* for respondent.

Lees, C.

This is a will contest, brought here by an appeal from an order of the district court denying contestant's motion for a new trial after findings had been made in favor of proponent. The grounds of contestant's

[1]Reported in 180 N. W. 1009, 181 N. W. 569.

objections to the will were that it had not been duly executed, that the testatrix was not of sound mind, and that the execution of the will had been procured by the exercise of undue influence.

Testatrix was a childless widow, 66 years old, and contestant is her only brother. She lived in Minneapolis and he in Superior, Wisconsin. The husband of testatrix died several years before the will was made. In 1918 she made a will in which the principal beneficiary was either the Augustana Mission Cottage of Minneapolis or the Woman's Missionary Association of the Augustana Church. A short time thereafter, she revoked it. In December, 1918, she became ill. She was living alone and there was no one to take care of her. Bothilda Svenson, who was superintendent of the Mission Cottage, had known her for several years. She learned that she was sick and on December 14 went to see her and on the same day took her to the Mission Cottage, where she remained until she died on January 17, 1919. On December 18 a physician was called, who thereafter visited her daily. She also had a nurse in constant attendance. The will was made on January 11. Ingrid Anderson was the nurse who was then in attendance.

Miss Svenson and Miss Anderson are the witnesses to the will. Miss Svenson testified that Mrs. Olson first spoke to her about a will the day before the will was executed. On the day it was executed she told her she wanted to give $500 to her brother and all the rest of her property to the Augustana Evangelical Church of Minneapolis for a parsonage. Miss Svenson communicated Mrs. Olson's wishes to an attorney, G. A. Petri of Minneapolis, who prepared the will accordingly and sent it to the Mission Cottage, where it was executed. Mr. Petri did not see Mrs. Olson before he drew her will and was not present when it was executed. The testimony of Miss Svenson and Miss Anderson showed conclusively that the will was executed in accordance with the statutory requirements. They both testified that Mrs. Olson's mind was clear and that she comprehended what she was doing, that she was under no restraint, and that the will was made in accordance with her wishes as she had expressed them to Miss Svenson. The proponent, who is the executor named in the will, called no other witnesses.

Contestant introduced the testimony of 12 witnesses. Some were

neighbors and others were Mrs. Olson's relatives. A number of them testified that at one time her finger had been bitten by a cat; that she constantly talked about the incident, believed she had been poisoned by the bite, and said she had cat's blood in her veins and marks on her body resembling a cat. Others testified she believed she was in communication with the spirit of her deceased husband and often said he came to the house at night and talked with her. She believed he was cold and wanted to disinter his body in order to clothe it more warmly. These were the principal vagaries of her mind described by the witnesses. It appeared that she went about alone and took proper care of herself until she became too sick to do so; that she collected rents from different tenants she had in her house, and that she had some money in Minneapolis banks and looked after it. The trial court found that she was mentally capable of making her will.

The unfounded beliefs entertained by Mrs. Olson are not reflected in the provisions of her will. It was not the offspring of delusions. They do not appear to have controlled her actions. They did not relate to her property or to the persons who might naturally expect to be remembered as the objects of her bounty. Fantastic beliefs are not so uncommon as to indicate a mind incapable of collecting and comprehending the facts a person should consider in making his will. The existence of a delusion, with respect to a particular subject or subjects, is not conclusive evidence of mental incapacity. The delusion may have no basis whatever and no evidence may suffice to dispel it, but, if it did not influence the testator with respect to the terms of his will, its existence does not invalidate the will. This is the settled doctrine in England since the decision of Banks v. Goodfellow, L. R. 5 Q. B. 549, and is the doctrine of practically all the American cases. 1 Schouler, Wills, § 159; 1 Whart. & Stille, Med. Jur. 81. It was stated in Fraser v. Jennison, 42 Mich. 206, 3 N. W. 882, and the statement quoted approvingly by this court in Church of St. Vincent De Paul v. Brannan, 97 Minn. 349, 107 N. W. 141.

The testimony relating to undue influence tended to show that Mrs. Olson was fickle-minded; that she had offered to give her property to several different acquaintances, if they would take her into their homes

and let her live with them; that she had said she did not care what became of her property so long as the Augustana Church did not get it, and that she appeared to be angry at the people in the church, although it was the church she attended and of which she was a member. Her brother's grandson had lived with her for a good many years. He had grown to manhood, married and established a home of his own. There was testimony that she had said of him that he only came to see her when he wanted money, and he admitted that he had gotten $120 from her. His mother, who lived at Superior, was at Mrs. Olson's house on December 7, found her sick, and was asked by her to stay with her over night, but declined on the ground that she had her own family to look after. A niece, who occasionally went to see Mrs. Olson, testified that she did not get along with her very well—that their ideas and ways of living were so different that they could not agree. We mention these circumstances to show that there was no great amount of affection between Mrs. Olson and these three relatives. She and her brother exchanged visits about once a year, but he had not seen her for three years prior to her death. He came in response to a message sent the day before she died, arriving in the evening, and stayed at the cottage until she died. Asked whether their relations had been friendly, he answered: "Well I never used to quarrel with the woman, but I corrected her lots of times when she was wrong."

Much is made of the circumstance that Mrs. Olson revoked her first will. The evidence does not clearly show whether the Mission Cottage or the Woman's Missionary Association of the church was the beneficiary named in the will. What led Mrs. Olson to revoke it is not made clear by the evidence. Miss Svenson testified that before Mr. Olson died she was told by both husband and wife that the property was finally to go to the Augustana Church. On the other hand, the attorney who drew the revocation of her first will testified that she told him she did not want to give her property to the church and that she had been induced to make the will and wanted to cancel it. The inference is that the first will was not made voluntarily and that some one had in some way influenced her to make it. Both witnesses to the second will attended the Augustana Church, but neither was a member. They were

not the witnesses to the first will.[1]  The Mission Cottage is supported by contributions from a number of sources, some connected and others disconnected with the church.  The pastor of the Augustana Church is its president.  It does not appear that Mrs. Olson discussed the terms of her last will with anyone except Miss Svenson.  Her testimony that Mrs. Olson herself brought up the subject of a will and voluntarily directed her to have it prepared as it was, is not unreasonable or improbable and is not contradicted.

The property involved consists of a small sum of money and a house and lot in Minneapolis.  The record does not show the amount of money or the value of the house.  After his sister died, contestant, on being informed that she had given him $500, expressed his satisfaction with the will.  Later on he became dissatisfied and instituted this contest.

These facts fall short of conclusively establishing a case of undue influence.  The law is so familiar that discussion is not justified.  See 3 Dunnell, Minn. Dig. §§ 10238, 10239.  The finding that the execution of the will was not procured by undue influence must be sustained.

After testifying that Mrs. Olson had a scar on her head, a witness proceeded to say that she had told her it was the mark left by a blow received when she was a child.  Contestant cannot complain because the court struck out this testimony as hearsay.

A witness, not an expert, was asked whether testatrix was of sound mind, basing his testimony on his conversations with her.  An objection was sustained on the ground that a sufficient foundation for an opinion had not been established.  The foundation was slight.  Whether it was sufficient was a matter largely within the discretion of the trial court.  There was no error in the ruling.  Clarke v. Philadelphia & R. C. & I. Co. 92 Minn. 418, 100 N. W. 231.

Testimony was offered to show the intended disposition of her property disclosed by testatrix in a conversation which took place in March, 1916.  It was excluded as too remote in point of time.  There was no offer to show what the testatrix said.  Prejudice to the contestant has not been made apparent, even if the conversation was not too far removed from the date of the execution of the will.

There are numerous other assignments of error based on rulings on

[1][See correction on page 127.  Reporter.]

the admission of evidence. All have been examined. They are not of sufficient importance to justify discussion. We think that, on the whole, contestant was not unduly restricted in presenting his evidence and that it would be difficult to sustain findings in his favor.

The decision of the trial court was right and the order denying a new trial is affirmed.

On February 18, 1921, the following opinion was filed:

PER CURIAM.

The statement in the opinion that the witnesses to Mrs. Olson's last will were not the witnesses to her first will is incorrect. Bothilda Svenson was a witness to both. That circumstance was entitled to consideration by the trial court, but was not of such importance in conjunction with the other facts and circumstances of the case as to compel the conclusion that either will was the result of undue influence on the part of Miss Svenson.

The petition for a rehearing is denied.