## IN RE ESTATE OF HARRY E. JENKS, DECEASED. HARRY J. JENKS, APPELLANT.[1]

October 9, 1925.

No. 24,231.

**When will is executed by person of sound mind in statutory manner, person who asserts exercise of undue influence has burden of proving it.**

1. A will executed by a person of sound mind in the manner required by law is presumed to be valid, and one who attacks it on the ground that its execution was procured by undue influence has the burden of proving that fact.

**What necessary to prove undue influence.**

2. To establish undue influence, the evidence must warrant the conclusion that the mind of the testator was subjected to that of another, so that the will is that of the other and not of the testator.

**Proof merely of opportunity and motive not sufficient.**

3. Showing opportunity and motive for undue influence without showing that it was exerted is not enough to sustain the burden of proof.

**When testator is presumed to know contents of his will.**

4. Where a testator produces an instrument which he executes in due form as his last will, he is presumed to know its contents, although he did not read it while the subscribing witnesses were present.

[1] Reported in 205 N. W. 271.

**Finding sustained by evidence.**

    5. The finding that the will in controversy was not procured by undue influence is sustained by the evidence.

    1. See Wills, 40 Cyc. p. 1150.
    2. See Wills, 40 Cyc. p. 1164.
    3. See Wills, 40 Cyc. p. 1166.
    4. See Wills, 40 Cyc. p. 1278.
    5. See Wills, 40 Cyc. p. 1165.

Harry J. Jenks appealed from a judgment of the district court for St. Louis county, Magney, J., admitting to probate the last will and testament of Harry E. Jenks, deceased, and sustaining an order of Gilpin, J., of the probate court. Affirmed.

*Leslie S. High,* for appellant.

*George K. Trask,* for respondent.

TAYLOR, C.

Harry E. Jenks, a resident of St. Louis county, died at Los Angeles, California, September 23, 1921, leaving a will which was presented for probate to the probate court of St. Louis county. He left as his sole heirs at law Anna Jenks, his second wife, and Harry J. Jenks, a son by his first wife. Harry J. opposed the allowance of the will, asserting that its execution had been procured by undue influence on the part of his stepmother. The will was sustained by the probate court, and he appealed to the district court. That court found as a fact that the testator was not acting under duress or undue influence in executing the will and affirmed the order of the probate court. A further appeal brings the case to this court. The appellant contends that the claim of undue influence was established as a matter of law notwithstanding the finding to the contrary.

The testator had been employed as a locomotive engineer at the Shenango Mine near Chisholm in St. Louis county for many years. During this time he received various sums of money from his mother. He was inclined to spend money freely, but his wife, Agnes R. Jenks the mother of the appellant, was saving and thrifty, and they

acquired several parcels of real estate, the title to at least a part of which was held by the wife. She died in 1916, leaving a will by which she gave a house and two lots to her son to be held in trust for him until he was 25 years of age, and the remainder of her property to her husband. The son also received her life insurance of $1,000. In December, 1918, the father, designated herein as the testator, married Anna Barkhirst who had been his housekeeper for something more than a year prior to the marriage. She had three grown children by a former marriage—two sons and a daughter. The youngest son was then in the Canadian army. The daughter had married J. W. Smith and lived in Los Angeles, California. The residence of the other son is not given. In December, 1919, the testator made a visit to Los Angeles, California, where he purchased a lot and built a bungalow. His mother furnished him $1,000 at this time. Whether the lot was conveyed to him or to his second wife the record leaves uncertain. In February, 1920, he returned to Minnesota and resumed his employment at the mine. Early in 1921, he and his wife decided to go to California by automobile. In April, 1921, he made a visit to his mother at Champaign, Illinois, where his wife joined him. While at his mother's he became partially paralyzed in consequence of which the automobile trip was abandoned and they went to California by train. His mother accompanied them. From their arrival in Los Angeles until his death in September, the three resided in the bungalow which he had built on his previous visit.

The will in controversy was executed at the home in Los Angeles on June 4, 1921. That it was executed in due form and that the testator possessed the mental capacity to execute it stand undisputed. The only testimony relating to the will or the manner of its execution is that of the two subscribing witnesses, Frederick Ahrens and J. W. Smith.

Ahrens was a neighbor living less than half a block from the testator. He states that some time during the day of June 4 Smith told him that the testator requested that he come over that evening and witness the testator's will; that he went over as re-

quested; that the testator was seated at a table in a big chair with pillows around him; that the testator had a document which he stated was his will; that the testator signed it, and then handed it to him and asked him to sign it as a witness; that he did so; that he did not read the will and knew nothing of its contents; that there was considerable general conversation, but none concerning the testator's property or the disposition made of it; and that Mrs. Jenks had never spoken to him concerning the will.

Smith was the husband of the daughter of Mrs. Jenks and lived about two blocks from the Jenks' home. He states that he knew nothing concerning the will until the testator spoke to him about witnessing it on the day it was executed; that he knew nothing of the provisions of the will or of the disposition the testator intended to make of his property until he read the will at the time of its execution; that when the will was handed him to sign as a witness the testator asked him to read it; that he did so and then for the first time learned that Mrs. Jenks and her children were the beneficiaries under it. The remainder of his testimony accorded with that of Mr. Ahrens. Mrs. Jenks was in the room while the will was being executed and Mrs. Smith was there a part of the time, but it does not appear that either had anything to do with its execution or said anything concerning it.

Only six witnesses were called or testified in the case—the two subscribing witnesses above mentioned, the contestant himself, Mrs. Jennie Micklau, a niece of the first Mrs. Jenks, Roy Humphrey and Daniel Mahony.

Humphrey, an employe of the mining company, merely identified certain signatures of the testator upon the pay-rolls and pay-checks of the company. Mahony, called by contestant as an expert on handwriting, merely testified as to certain discrepancies between these signatures and the signature to the will. He said, however, that these discrepancies may have resulted in consequence of a difference in the situation and physical condition of the testator at the time he signed the will.

The contestant was 17 years of age when Mrs. Barkhirst was engaged by his father as housekeeper. It appears from his testi-

mony that both before and after she became his stepmother she took him to task for staying out late at night and going to pool-halls and spending money; that he wanted to quit school and go to work, and she tried to have him remain in school; that he went to work for the mining company in 1918; that while he lived at home he turned his pay-checks, except the first two, over to his father who apparently turned the money over to his stepmother; that he had to ask her when he wanted spending money, and was dissatis-fied with the amounts she gave him as he thought he was entitled to all that he earned; that, on complaining to his father, his father advised him to save some for a rainy day and usually sided with his stepmother; that he went to work at another mine some 8 miles distant in 1919 and lived at the mine and thereafter received his pay himself and spent it as he pleased; and that one of his reasons for going to this mine was to avoid the supervision and criticisms of his stepmother. He states that he never heard her say anything to his father concerning the disposition to be made of the father's property, but that she told him, the contestant, at one time that she was going to see that her property and his father's property was put together and divided equally among all the children—the contestant and her three children. He was unable to recall when this conversation took place, but was of the impression it was after his father returned from his first visit to California.

Mrs. Micklau states that Mrs. Jenks complained to her of the spendthrift tendencies of the boy and the trouble they were having with him; that she made the first complaint the last of December, 1918; that at this time the father seemed to have taken the boy's part and Mrs. Jenks did not like it; that she said:

"She would burn every piece of property that man owned (using an oath) and send him to the poor house before Harry J. would get any benefit;"

that she complained of the conduct of the boy on two subsequent occasions, but never mentioned the property except that one time; and that she seemed bitter at that time. This witness also states that the boy was like his father; that both liked to spend money

and have a good time; that the boy, not having a saving father, had no one to save for him if Mrs. Jenks didn't; that she told Mrs. Jenks it "was all right for her to give (him) the best advice she could."

There is not a word of testimony in the case that Mrs. Jenks ever had anything to do with the will, or had any knowledge of its preparation, or had ever discussed with the testator the matter of making a will or the disposition to be made of his property.

The contestant insists, in effect, that the inferences from the situation of the parties and the relations existing between them, above recited; from the statements made to him and Mrs. Micklau by Mrs. Jenks—one more than a year before the execution of the will, the other more than two years before that date; from the fact that the record fails to show affirmatively by whom or at whose instance the will was drawn or who furnished the data for drawing it; and from the provisions of the will itself and the fact that it was not read by or to the testator at the time he executed it, are conclusive that the execution of the will was procured by undue influence exerted by Mrs. Jenks. We are unable to sustain this contention.

The will gave all the testator's property in equal shares to his wife and her three children. The sixth paragraph reads:

"I do not give any of my estate to my son, Harry J. Jenks, for the reason that his mother provided for him in her will."

The contestant placed the value of the real estate given him by his mother at $3,500 or $4,000. The value of the testator's property is not given, although there is evidence that he received rentals of about $70 per month. There is some ground for the claim that the will is unnatural in excluding the testator's own son and giving three-fourths of his property to the children of his second wife, who are not shown to have been on intimate terms with him nor to have had any claims upon his bounty. But the testator had the right to dispose of his property as he saw fit. If he exercised his own judgment and expressed his own intention. it is not the province of

the courts to question the justice or propriety of the disposition he made of it. As said in Re Storer's Will, 28 Minn. 9, 8 N. W. 827:

"Any man of sufficient capacity, where his power to dispose of his property is not limited by statute, has a right, in disposing of it by will, to use his own judgment and consult his own preferences, without regard to how such disposition may be approved or disapproved by others."

The testator having been of sound and disposing mind and the will having been executed as required by the statute governing the execution of wills, it is presumed to be valid and the burden was upon the contestant to establish the undue influence asserted. Mitchell v. Mitchell, 43 Minn. 73, 44 N. W. 885; In Re Hess' Will, 48 Minn. 504, 51 N. W. 614, 31 Am. St. 665; Thill v. Freiermuth, 132 Minn. 242, 156 N. W. 260.

The law governing such cases is well settled in this state. In Thill v. Freiermuth, supra, the numerous prior cases were so fully and carefully considered and the conclusions reached therein so clearly stated that it is not necessary to review them here. It is sufficient to say that a finding of undue influence is not warranted, unless it appears that another exerted such constraint or pressure upon or control over the testator in the matter of the making of the will that he ceased to act as a free agent, and that the will gives effect to the purpose and intent of the other instead of the purpose and intent of the testator. While undue influence may be proven by circumstantial evidence—and often cannot be proven otherwise—the circumstances "must be such as, taken all together, point unmistakably to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter, and not of the former; mere ground of conjecture or guess is not enough."

It is not enough to show that another person had the opportunity to exert undue influence and a motive for exerting it; the proof must go further and show that he did exert it. That a will is harsh or unnatural is not of itself evidence of undue influence, but is a cir-

cumstance to be taken into consideration in weighing other evidence tending to show such influence. See cases cited in Thill v. Freiermuth, supra; also Estate of Jernberg, 153 Minn. 458, 190 N. W. 990.

The contestant stresses the fact that the testator did not read the will in the presence of the subscribing witnesses at the time it was executed. As he had it in his possession and produced it for signature himself, the fact that he did not read it at that time is no evidence that he had not read it. On the contrary, the presumption is that he had previously read it and had full knowledge of its contents.

The learned trial court reached the correct conclusion from the evidence, we find no error in its rulings, and the judgment is affirmed.