MAY A. SULLIVAN, EXECUTRIX OF ESTATE OF ALICE C. MANTERNACH, v. FREDA BROWN AND ANOTHER.[1]

March 5, 1948.

No. 34,564.

*Lipschultz & Grady,* for appellant.
*Frank J. Danz,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order denying plaintiff's motion for amended findings and conclusions or a new trial.

Plaintiff as executrix of the estate of Alice C. Manternach contends that defendants exerted undue influence over decedent and that the latter lacked mental capacity at the time of the transactions here involved.

The questions for consideration are: (1) Was there sufficient evidence to sustain the trial court's findings that defendants did not exercise any undue influence over decedent and that the latter was mentally competent at the time of the transactions here involved? (2) Did the trial court commit prejudicial error in the admission of evidence?

Decedent, a resident of St. Paul, Minnesota, died testate on August 21, 1945. Defendants, who were not related to decedent, are sisters; both are registered nurses and have practiced their profession in St. Paul for many years. They had lived at their home in St. Paul where decedent stayed with them for about 12 years prior to July 1946. Decedent was employed for many years in the probation office in the courthouse in St. Paul and continued such employment until about March 1, 1945, when she was granted a

leave of absence upon the advice of her physician. She first became acquainted with defendants in 1933, when defendant Bertha Werner went to decedent's home to act as a nurse for decedent's brother who was ill. The nursing service continued for about four years.

It appears from the evidence and findings that after 1933 a strong friendship developed between decedent and defendants (they exchanged Christmas gifts and were apparently devoted to each other) and that this friendship continued until the death of decedent. It also appears that decedent had been living alone in her home in St. Paul subsequent to the death of her father and brother until May 1944, when she went to live with defendants. She continued to live with them until she died, except for a time from March 3 to May 11, 1945, when she was hospitalized for high blood pressure, kidney trouble, and slight paralysis.

Decedent's employer, John J. Doyle, testified that he had known decedent for about 22 years and that in the later years of her life she was employed as a probation officer in the Ramsey county probation office. He was in close contact with her work and saw her frequently while she was in his employ. He said that he observed a change in her physical and mental condition in 1944. He testified that about a year before she asked for a leave of absence she was not able to handle dictation or meet a situation properly, and that he had relieved her of "a lot of work" at that time. It was his observation that during the last six months of 1944 when she was employed in his office she was not coherent in her talk with people in connection with some of her duties. He testified that while decedent was ill at defendants' home he inquired about her condition and that defendant Bertha Werner informed him that "she wasn't very well and she had kidney trouble and at times she was mentally off." He also testified that Miss Werner suggested that he see Dr. Benjamin B. Souster, who was attending decedent prior to her death. On January 26, 1945, Mr. Doyle wrote Dr. Souster, enclosing a statement from decedent authorizing the doctor to give him a statement of her physical condition. In his letter Doyle said it was

necessary that he have complete information as to her physical condition, and among other things he said that she seemed to have difficulty in coördinating. Dr. Souster replied February 6, 1945, stating in part that decedent was suffering from an essential hypertension associated with some impairment of her kidney function; that "Her coördination is poor and she has some speech defect as well as very definite impairment in her thinking and memory processes." When questioned on direct examination as to whether there was something wrong with decedent's thinking and memory processes at the time he wrote Doyle, the doctor said that was determined primarily from the information in the letter from Doyle, as he made no special test to determine it.

After receiving this letter from the doctor, Mr. Doyle granted decedent a leave of absence as of March 1, 1945. She never returned to her employment. Doyle called on her several times for a few minutes at a time while she was in the hospital and observed that her answers were disconnected. He also called on her when she returned from the hospital to defendants' home and said that her answers seemed to be better. He said that she apparently had access to the whole house, to all appearances seemed to be getting good care, and that she and defendants appeared to be devoted to each other. He also said, "I didn't think anybody else would take care of her but the nurses [defendants]." He concluded by saying that decedent seemed to be satisfied with the place where she was living.

Decedent was under the care of Dr. Souster from June 2, 1944, until she died. He testified that she had been hospitalized from August 7 to August 31, 1944, mainly for observation and kidney function tests. At times when she was in the hospital in 1944 and 1945 and sometimes when at home she was in a state of confusion as to where she was, and at times she had delusions about her father and brother and spoke of them as though both were living, when in fact they were both dead. The doctor described the cause of such confusion as cerebral spasms. He claimed that these spasms

were temporary and that she was mentally competent to handle her own affairs most of the time until shortly before she died.

"Q. When you say she was clear do you imply she was well enough to understand taking care of business affairs?

"A. I think for the most part up until perhaps the middle of August or thereabouts, I mean except for a few intervals like a few days in the hospital even, I mean she was perfectly able and competent.

\* \* \* \* \*

"Q. Would you state during her stay at the hospital at either time she was in such condition as to be able to leave the hospital and take care of some business affairs and then return to the hospital?

"A. The most—for the most part in either hospitalization she could have done that."

The record shows that until sometime in July 1945 decedent made out bank deposit slips in her own handwriting.

On November 8, 1944, decedent made her last will and testament, which was probated in Ramsey county. Emma Thill, one of the two residuary legatees in the will, testified that she saw decedent daily in January and February 1945 and for the last time about two weeks before she died. She testified that she saw her three times in 1945 while decedent was residing in defendants' home. She said that there was evidence of friendliness between defendants and decedent and that decedent seemed to be very well satisfied and happy in defendants' home. The witness said that she had some business transactions with decedent on May 19, 1944, at which time she said that the latter was mentally clear. The witness was asked by the court, "\* \* \* was there ever a time you saw her after May 19th, 1944 when she was not mentally clear?" to which she replied, "I would say not."

The items which plaintiff seeks to have returned for the benefit of the estate include the following: The proceeds from a joint bank account held by decedent and defendant Freda Brown totaling $2,510.87 at the time of decedent's death; two Northern Pacific

Railway Company bonds, each in the principal sum of $1,000, valued at $2,460 at the time of decedent's death, which bonds had been assigned by decedent to defendant Freda Brown; United States War Savings bonds in the principal sum of $3,500, purchased with the money of decedent and made payable on her death to defendant Freda Brown in the amount of $1,750 and to defendant Bertha Werner in the amount of $1,750; a fur coat of an estimated worth of $400 and a mink scarf of an estimated worth of $100; cash in the amount of $375; and such other sums as the accounting which plaintiff prayed for might reveal that plaintiff was entitled to. The court found:

"6. That defendants did not exert any undue influence upon said Alice C. Manternach, and that Alice C. Manternach was mentally competent at the time of,

"(a) the creation of said joint bank account in December, 1944,

"(b) the purchase of said United States War Savings Bonds in December, 1944,

"(c) the assignment of said railway bonds in June, 1945,

"(d) the gifts of said sealskin fur coat and mink scarf and cash in the sum of $375.00.

"(7) That plaintiff and the Estate of Alice C. Manternach, Deceased, or either of them, have no right, title, or interest in and to the said joint bank account, United States War Bonds, Railway Bonds, sealskin fur coat, mink scarf or cash of $375.00 described in plaintiff's complaint herein, and that the defendants as beneficiaries, assignees or donees respectively are the owners thereof and entitled to possession of same."

■ It is a well-established rule of this court that when an action is tried by a court without a jury its findings of fact are entitled to the same weight as the verdict of a jury and will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence. This rule applies whether the appeal is from a judgment or from an order granting or denying a new trial. See, 1 Dunnell, Dig & Supp. § 411, and the long line of Minnesota decisions therein cited.

■ Plaintiff claims that undue influence was exerted over decedent by defendants and that decedent was not mentally competent at the time of the transactions herein considered. The trial court found to the contrary. It is elementary that any person competent to transact ordinary business may give what he owns to another person. 3 Dunnell, Dig. § 4022, and cases under note 4.

> "Undue influence is coercion, amounting to a destruction of one's free will, by means of importunities, flatteries, insinuations, suggestions, arguments, or any artifice not amounting to duress. It is ordinarily of an insidious nature, and exercised by one in close confidential relation to the victim. Exact definition is impossible. Each case must necessarily be determined largely by its own facts." 6 Dunnell, Dig. & Supp. § 9949, and cases under note 66.

In discussing the matter of undue influence in connection with a will, this court said in In re Estate of Olson, 176 Minn. 360, 365, 223 N. W. 677, 679:

"* * * It is necessary that the circumstances relied on to show undue influence be such as 'taken all together, point unmistakably to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter, and not of the former; mere ground of conjecture or guess is not enough.' In re Will of Nelson, 39 Minn. 204, 206, 39 N. W. 143 [144]."

Again, in In re Estate of Mollan, 181 Minn. 217, 219, 232 N. W. 1, 2, this court held:

"The evidence of undue influence to be sufficient to set aside a will must be clear and convincing. The fact may be proved wholly or in part by circumstantial evidence; but on the whole it must be such as reasonably and clearly to convince the trier of fact that undue influence was successfully practiced. In re Nelson's Will, 39 Minn. 204, 39 N. W. 143; In re Hess' Will, 48 Minn. 504, 51 N. W. 614, 31 A. S. R. 665; In re Estate of Jenks, 164 Minn. 377, 205 N. W. 271; 6 Dunnell, Minn. Dig. (2 ed.) § 10241."

In connection with the question of the mental capacity of decedent, it appears to us that the rule laid down by Mr. Justice

Mitchell in Schmidt v. Schmidt, 47 Minn. 451, 457, 50 N. W. 598, 600, applies. It was there said:

"* * * It is elementary law that mere mental and physical weakness, caused by age or sickness, does not amount to mental incapacity, provided the party is capable of fairly and reasonably understanding the matter in hand."

This rule has also been followed in In re Estate of Jernberg, 153 Minn. 458, 190 N. W. 990, and In re Estate of Geske, 211 Minn. 447, 1 N. W. (2d) 423.

In Church of St. Vincent de Paul v. Brannan, 97 Minn. 349, 351, 107 N. W. 141, 142, a proceeding before a court without a jury involving the validity of a will, this court said:

"The evidence tending to show the mental incapacity of deceased is voluminous and conflicting, presenting a case peculiarly proper for the trial judge to determine. The witnesses were before him, and every opportunity afforded to judge of their credibility and fairness. It may be conceded that the evidence shows that the testator was mentally incompetent for some days prior and subsequent to the execution of the will; but there was affirmative evidence, for the trial court to accept or reject as true or false, that he was in a rational and lucid state of mind at the time of its execution, and had been so for some hours immediately preceding the act. If such was the state of his mind at the time, if his then condition enabled him to intelligently give directions for the disposition of his propery, the will is valid, however feeble he may have been immediately preceding."

It was held that the question whether the testator was of sound or unsound mind or mentally competent to make the will was, on the evidence, a question of fact, and the findings of the trial court were sustained.

In reviewing the case before us with reference to the issues of undue influence and mental capacity, we have tried carefully to consider the facts as presented by the record. Here we have a situation where plaintiff might suspect that because of the close

contact with defendants during the times the gifts and assignments were made undue influence was exerted by them. However, that is not sufficient, as "mere ground of conjecture or guess is not enough." The evidence must be clear and convincing. The burden of proof was on plaintiff. Each case must be determined largely by its own facts. It seems uncontradicted from the record that decedent and defendants were close friends for at least 12 years prior to decedent's death. It appears that decedent lived alone for a time after her brother died. No one appears to dispute the fact that she had a good home with defendants, that she was happy there, and that they were devoted to each other. We may infer at least that decedent made the specific bequests and legacies she desired to make when she executed her last will and testament on November 8, 1944. In that will, she appears to have taken into consideration the friends, relatives, and church organizations she desired to benefit. The will was probated in Ramsey county, and no issue was raised as to undue influence being exercised or as to decedent's mental capacity at the time she made the will. The residuary legatees named in the will and the ones who would benefit by a reversal of this case were friends of decedent the same as defendants. Even one of these residuary legatees testified that there was evidence of friendship between defendants and decedent, that the latter seemed to be very happy and satisfied in defendants' home, and that there was no time when she (such legatee) saw decedent after May 19, 1944, when she could say that decedent was not mentally clear. Decedent's former employer testified that he "didn't think anybody else would take care of her but the nurses." Her doctor, although admitting in his letter to Mr. Doyle on February 6, 1945, that her coördination was poor and that there was a very definite impairment in her thinking and memory processes, modified this on his direct testimony when he said that his conclusion at that time was determined primarily from the information in Mr. Doyle's letter, as he made no special test to determine it. He also testified that she was apparently competent to understand taking care of business affairs except for a few intervals such as the few days

in the hospital. He even said that for the most part during the times decedent was in the hospital she would have been able to leave the hospital, take care of some business affairs, and then return to the hospital.

Arthur E. Shanahan, an attorney, testified that at the request of decedent he went to the home where she was residing on June 6, 1945, with reference to the transfer of certain bonds to defendant Freda Brown. He said that he was alone with decedent part of the time, that he talked the matter over with her, that decedent informed him that she was giving the bonds to Mrs. Brown, and that she stated she wanted her to have them and that "she wanted it done so that there would be no possible trouble or misunderstanding and that I was to make the transfer for her as a gift." It was his opinion that on that date decedent "was clear and of sound mind."

It is true that defendants would have had a better opportunity during the time decedent lived with them to influence her than would the residuary legatees or anyone else, but we cannot determine from the record that this was done to the extent at least of reversing the decision of the trial court. We are of the opinion that the findings of the court relating to the questions of undue influence and mental capacity are sufficiently supported by the evidence and should be sustained.

■ Plaintiff claims that the court erred in permitting defendant Freda Brown to testify as to conversations with decedent to show mental condition, on the ground that the statements related to particular issues involved in the litigation. Defendants contend that plaintiff invited the introduction of this testimony, and that she is therefore not in a position to raise any objection. This point is disputed by plaintiff. Unless plaintiff did invite the introduction of this testimony, it would have been inadmissible under Larson v. Dahlstrom, 214 Minn. 304, 310, 8 N. W. (2d) 48, 52, 146 A. L. R. 245, where this court said:

"* * * Under the 'verbal act' theory, an interested party may relate statements of a decedent made during the latter's lifetime

to show mental condition. However, it is now a well established rule that, when an interested party seeks to testify to declarations of this kind, the statements sought to be shown under such theory may not relate to the particular issues involved in the litigation."

We need not pass on the question as to whether this testimony was invited, because the trial court in its memorandum stated that it disregarded all such testimony in reaching its conclusion.

Plaintiff also contends that the trial court erred in admitting certain evidence of the conclusions of Freda Brown and Emma Thill, nonexpert witnesses, to the effect that at the times material decedent was mentally competent, on the ground that such testimony was without foundation. In Bird v. Johnson, 199 Minn. 252, 254, 272 N. W. 168, 170, it was held:

"* * * Nonexpert witnesses may give an opinion as to mental capacity only after having first stated the facts and circumstances upon which the opinion is based so that the jury can determine whether the facts, as well as the opinion itself, are correct."

Conceding this to be the law, it was a matter largely within the discretion of the trial court as to the sufficiency of the foundation. See, In re Estate of Olson v. Johnson, 148 Minn. 122, 180 N. W. 1009, 181 N. W. 569; Marsh v. Henriksen, 213 Minn. 500, 7 N. W. (2d) 387; In re Estate of Crosby, 218 Minn. 149, 15 N. W. (2d) 501.

We shall not consider further the ruling of the trial court with reference to the admissibility of evidence, inasmuch as this case was tried to the court without a jury. The distinction with reference to the admissibility of evidence between cases tried before a court and those tried before a jury was well defined in Mankato Mills Co. v. Willard, 94 Minn. 160, 164, 102 N. W. 202, 203, where this court said:

"If the trial of the issues of fact had been by a jury, the admission of the incompetent evidence would have been reversible error, for the evidence related to a material issue, and, the court having admitted the evidence, the jury would have been bound to consider it. But this reason does not apply to cases where the issues of

fact are tried by the court without a jury. Hence the rule is, where issues of fact are tried by the court without a jury, and incompetent evidence is admitted, but the competent evidence is sufficient to support the findings of fact, and there is no reasonable ground for inferring from the character of the incompetent evidence that it was or might have been a material factor in the court's determination of the facts, the admission of such evidence is not reversible error. 2 Enc. Pl. & Pr. 567; Hogan v. Vinje, 88 Minn. 499, 93 N. W. 523."

This was held to be the applicable rule by this court in the recent case of Fleetham v. Lindgren, 221 Minn. 544, 22 N. W. (2d) 637.

Affirmed.

[1]Reported in 31 N. W. (2d) 474.