## MARGARET E. DEMPSEY AND ANOTHER v. JOSEPH F. MEIGHEN AND OTHERS.

90 N. W. (2d) 178.

February 28, 1958—No. 37,146.

*Meighen, Sturtz & Peterson,* for appellants.
*Bang, Nierengarten & Hoversten,* for respondents.

MURPHY, JUSTICE.

This is an appeal from an order of the District Court of Nobles County denying a motion for a new trial. The plaintiffs, Margaret E. Dempsey and her husband, brought this action against her brother, Joseph F. Meighen, his wife, the Emmons Oil Service, Inc., a corporation, and others to set aside a quitclaim deed and for an accounting of rents and profits. The court made findings for the plaintiff against the defendant Joseph F. Meighen, and the above-named defendants appealed. The action was dismissed as to the other defendants.

The plaintiff Margaret E. Dempsey and defendant Joseph F. Meighen are surviving children of Thomas J. Meighen, Sr., deceased, who during his lifetime acquired more than 4,000 acres of farmland in southern Minnesota and certain business property at Preston, Minnesota. This action involves a tract of 400 acres of farmland located in Nobles County near the village of Lismore.

During the economic depression of the twenties and thirties, Thomas J. Meighen, Sr., suffered severe financial reverses. In an attempt to salvage his assets, he adopted the practice of deeding property to relatives, having them place mortgages on the property and turn the proceeds over to him, and then in turn taking back quitclaim deeds running either to himself or in blank. Included among the assets conveyed to relatives was the 400-acre Nobles County farm which was conveyed to Margaret E. Dempsey on November 16, 1929, by warranty deed in which Thomas J. Meighen's wife joined as a grantor. It appears

that this conveyance was made without the knowledge of Margaret and wholly without consideration. At the time there was a first mortgage of $11,000 on the property. Thomas J. Meighen had the deed recorded on January 3, 1930, and mailed it to his daughter at her home in Boston, Massachusetts. About six months later the father sent to his daughter a quitclaim deed requesting that she and her husband sign and execute it in blank. The deed covered the same 400-acre Nobles County farm. In accordance with her father's request, Margaret and her husband executed the deed and returned it to him without the name of the grantee having been inserted.

The mortgage of $11,000 on the farm became due March 1, 1931. The father was unable to pay the mortgage but secured an extension for one year by paying $1,000 to the holder of the mortgage. This money came from Margaret's husband, Earl M. Dempsey. On March 31, 1931, the father sent a letter to Margaret enclosing a promissory note in the sum of $1,000. The letter includes this statement:

"The mortgage on that 400 [acre] farm was $11,000—It fell due March 1st—I finally arranged to get an extension for one year by paying $1000.00—Let us hope conditions will be better by that time— That farm stands in your name on the record—the quit-claim you gave back was only to protect your mother in case of accident—It has not been recorded and likely never will be—That farm should be fairly worth $75.00 per acre I think would sell at forced sale for $50.00 per acre So you are safe—But as a matter of business: I am enclosing a note $1000.00 signed by your mother and myself."

It was Margaret's testimony that the above-quoted letter was the last time her father mentioned the 1930 quitclaim deed to her.

In the early 1930's Thomas J. Meighen was acting in a fiduciary capacity for four members of the McHale family. As a result of this relationship, he became indebted to the McHales in a sum in excess of $10,000. In the fall of 1931, the McHales agreed to accept promissory notes for the money he owed them. These notes were guaranteed and endorsed by his son, Joseph F. Meighen. Joseph testified that the quitclaim deed from Margaret to the Nobles County farm executed in blank was delivered to him by his father on the same day that the

McHale notes were signed. It appeared from his testimony that the deed was transferred to him as security for any liability he might sustain by reason of his endorsement on the McHale notes. At the time the quitclaim deed was delivered to Joseph in the fall of 1931, the name of the grantee had not been inserted. However, Joseph took possession of the deed and placed it in his own safety deposit box in the First National Bank of Preston, Minnesota. Margaret was not informed that Joseph had taken possession of this deed.

In the fall of 1933, the McHale notes again became payable and Thomas J. Meighen and his son Joseph made arrangements for the payment of the interest and an extension of the time of payment. According to the testimony of Joseph, after the interest was paid and the notes were extended and after the McHales left the bank, he took the quitclaim deed to the Nobles County farm from his safety deposit box and showed it to his father. He then typed in his own name as grantee, together with the name of the county of residence, after which he again showed it to his father who was present during the entire typing operation; his father then returned the deed to him and he in turn placed it in his safety deposit box where it remained until his father's death. Margaret was not informed that Joseph's name had been inserted in the deed as the grantee. This deed was not filed for record until May 13, 1943.

Margaret testified that it was not until she visited Preston in 1950 that her brother informed her that the Nobles County farm had been placed in his name. She testified that when she broached the subject to him he told her in effect there was no point in discussing it; that he said "That farm is mine. There was a quitclaim given father. I recorded it some years ago and the farm belongs to me."

In December 1935, Thomas J. Meighen and his wife went to Boston to spend Christmas with their daughter Margaret. On this trip he took with him a second deed covering 160 acres of the 400 acres in the Nobles County farm. This second deed was executed by Margaret and her husband, Earl, on January 9, 1936, and delivered by them to the father with the name of the grantee left blank. While visiting in Pittsburgh, on his way home from Boston, the father became ill and was confined to a hospital. This was about February 7, 1936. Joseph

was immediately notified of his father's illness and he flew to Pittsburgh. While Joseph was in Pittsburgh, his father produced the second deed to the 160 acres of the Nobles County farm which had been executed on January 9, 1936, by Margaret and her husband. Joseph typed in his own name as grantee in the presence of his father and the deed was delivered to him. This deed has never been recorded.

On January 9, 1936, the same day the blank deed to the 160 acres was executed, and about one month prior to his death, the father made a record or memorandum in which he noted that there still remained in the name of his daughter Margaret "240 acres of land in the Town of Lismore, Nobles County, Minnesota, * * *." During the interval between the making of this memorandum and the death of the father, his son Joseph did not see him except in the hospital in Pittsburgh. Joseph testified that during the course of his visits with his father at the hospital the deed to the 160 acres was executed, but there was no testimony that anything had been done in regard to the quitclaim deed of July 28, 1930, covering the 400-acre tract.

The father died in Pittsburgh on February 12, 1936. The funeral was held in Preston, Minnesota, on February 14. John F. D. Meighen of Albert Lea, a nephew of Thomas J. Meighen, attended the funeral at Preston. According to the testimony of John F. D. Meighen, hereinafter referred to as John, and that of Joseph, they went to the First National Bank of Preston, accompanied by Margaret, to discuss the family business and financial affairs on the afternoon of February 14, 1936. John was interested in the estate as a creditor since he had loaned considerable sums to Thomas J. Meighen in the past. Joseph testified that at that time he took from his deposit box the quitclaim deed of July 28, 1930, covering the 400 acres of land in Nobles County and showed the deed to John and Margaret. Both John and Joseph testified that at this meeting the name "Joseph F. Meighen" appeared in the deed as grantee. Margaret testified she did not recall having been at the meeting but does not deny that she may have been present. In any event, Margaret did not recall seeing the 1930 quitclaim deed at that meeting.

As a creditor, John was concerned as to the solvency of the estate and wanted to determine for his own information what, if any, equity

remained in the various properties. He accordingly prepared a folio or office record concerning the property of the decedent, Thomas J. Meighen. Most of the information contained in this record was obtained from Joseph, or from documents Joseph produced, and from John's independent investigation. Some of the information came from Margaret and some from Thomas J. Meighen's widow. John testified that Margaret showed him the memorandum Thomas J. Meighen made on January 9, 1936, in Boston concerning the Nobles County land. From this memorandum John obtained the information contained on page 14 of the folio where reference is made to the memorandum and the fact that Thomas J. Meighen believed that 240 acres remained in the name of Margaret. John testified that the 1930 quitclaim deed was one of the documents from which he obtained some of the information for this particular record.

After the death of her father, Margaret relied upon her brother to look after the entire estate including the Nobles County farm. Joseph led her to believe that the income from the farm was being used to pay taxes, insurance, interest, and claims against the estate, in particular the McHale claims. During his lifetime the father used the income from the farm for his own purposes with the knowledge and acquiescence of Margaret. After the death of her father, Margaret was agreeable that the income be used to pay the claims against the estate in order that it be expeditiously closed. The fact was, however, that the State Bank of Lismore acted as agent in handling the farm and had credited the net income to the personal account of Joseph. The net income from 1936 to 1955 totaled $8,062.01. Joseph used these funds for his own personal needs. This fact was not discovered by Margaret until 1954 when she and her son visited the farm to discuss with the tenant his interest in purchasing the property.

During his lifetime, Thomas J. Meighen managed the Nobles County farm, either personally or through his agent, the State Bank of Lismore. Following his death, the Nobles County farm was managed almost exclusively by the State Bank of Lismore. Joseph was neither on the farm nor at the State Bank of Lismore from 1943 to 1955. At the trial the tenant of the Nobles County farm testified that Joseph was on the farm two or three times from 1936 to 1943 and at no time

from 1943 to 1955. Joseph did not answer correspondence directed to him by the tenant during the same period of time. No improvements were made to the farm from 1935 to 1955 except those made by the tenant. The tenant testified that he received no telephone calls from Joseph from 1943 to 1955.

Following the death of Thomas J. Meighen, Margaret wrote several letters to Joseph with regard to settling the estate. These letters were ignored so she turned to John, an attorney at law, for advice and counsel. It is clear from the correspondence between Margaret and John that both of them were under the impression that she had an interest in the Nobles County land. This is evidenced by a letter from John to Margaret dated July 22, 1953, in which he said:

"Now there are lands in your name according to my records that could be sold to third parties without reference to closing the estate, as they were deeded to you before Uncle Tom's death. If you still have a copy of the statement of his affairs that I prepared shortly after his death, you will find those lands listed on pages 12, 13, 14 and 15, and the legal descriptions are given in full on those pages."

From 1936 to 1955, Joseph and John were often in contact with each other concerning matters relating to the estate and John often sent to Joseph copies of letters which were writtten to Margaret. Joseph's testimony is contradictory as to whether or not he knew Margaret was claiming the Nobles County farm. At one point he said he had no notice of her claim until shortly before this action was commenced, yet he admitted that John had informed him between 1950 and 1954 that Margaret was arguing with him over who owned the Nobles County farm.

In 1950 Joseph compromised and settled his liability on the McHale notes for the sum of $6,000. This settlement was made with money borrowed from John. On March 17, 1950, the Nobles County farm was transferred to the Emmons Oil Service, Inc., a corporation, owned by John. No consideration changed hands at the time of the transfer. Joseph testified that in consideration of the transfer John had agreed to advance, in the future, whatever was neeessary to settle the McHale claims. John said the transfer was made to get the land out of the

family name in order to prevent creditors of the estate from satisfying their claims from it and to give John security for the estate's indebtedness to him. Margaret was not informed of this transfer until John wrote to her on August 5, 1950. Joseph continued to receive all of the income from the land after the transfer.

Subsequent to the conveyance of the entire 400 acres to the Emmons Oil Service, Inc., that corporation conveyed back to Joseph by deed the 160 acres described in the January 1936 deed. Joseph then sold this 160 acres in two parcels for a total of $20,000. Thereafter, he paid Margaret the $1,000 loan which she and her husband had made to the father in 1931, with interest. He paid John $10,000 to cover advances and attorneys' fees covering a period of approximately 20 years, and after paying the interest on the mortgage, kept the balance.

The trial court found that Joseph acquired title to the 160 acres referred to in the blank deed of January 9, 1936. The court further found that sometime between February 12, 1936, and May 13, 1943, Joseph fraudulently and without authority from anyone inserted his own name as grantee in the quitclaim deed of July 28, 1930, covering the entire 400 acres. The trial court further found that Margaret was the owner of the remaining 240 acres subject to a proportionate share of an existing mortgage, and that, after making allowance for certain credits, her brother Joseph was indebted to her for rents and profits in the sum of $5,760.68. No claim to the property is made in behalf of the estate or in behalf of creditors of the estate.

The first issue presented by the defendants relates to an alleged error on the part of the trial court in sustaining an objection made by the plaintiffs to the admission in evidence of a letter sent to the defendant Joseph Meighen by one L. A. Loosbrock, an officer of the State Bank of Lismore, by which it was sought to establish that during his lifetime the father made a statement to Mr. Loosbrock to the effect that his son Joseph was the owner of the Nobles County farm. From the middle twenties until 1942, Mr. Loosbrock held various offices in the State Bank of Lismore from cashier to president. In this letter dated August 26, 1936, Mr. Loosbrock made this statement:

"Now regarding this land as I understood your father this land was

deeded to you some years ago already. Has the deed been recorded yet?"

The plaintiffs objected to the admission of this letter on the grounds of insufficient foundation and hearsay. The defendants argue that it was error to exclude the letter on two grounds: (1) It should have been admitted under the declaration against interest exception to the hearsay rule; and (2) it should have been admitted as a letter written in the "usual course of correspondence."

■ The exception to the hearsay rule relating to declarations against interest is defined in 5 Wigmore, Evidence (3 ed.) § 1455, as follows:

"The Exception requires, like most of the others, first, a Necessity for resorting to hearsay * * *, *i.e.* the death of the declarant, or some other condition rendering him unavailable for testimony in court; and, secondly, a Circumstantial Probability of Trustworthiness * * *,—in this instance, the circumstance that the fact stated, being against the declarant's interest, is not likely to have been stated untruthfully."

Moreover, the statement must be a declaration against a proprietary or pecuniary interest of the declarant.[1] We have held that declarations of persons since deceased as to facts relevant to the issue are admissible in evidence between third parties when it appears that such facts were opposed to the pecuniary interest of the declarant and related to a matter of which he was personally cognizant and that he had no probable motive to falsify the facts. However, whether a foundation for the admission of such declarations has been shown is a question addressed to the discretion of the trial court,[2] and because of the inherent weaknesses to which the unsworn statements of deceased persons are exposed, evidence of such declarations should be received with caution.[3]

Since the father had express or implied authority to fill in the name of the grantee in the deed and thereby benefit himself in a proprietary manner, a statement made by him to the effect that the land had been

[1] McCormick, Evidence, § 254.
[2] 7 Dunnell, Dig. (3 ed.) § 3298, note 60.
[3] 31 C. J. S., Evidence, §§ 265, 266.

conveyed to Joseph would be a declaration against interest and, if Loosbrock were alive and not otherwise incompetent to testify, any statement made by Thomas J. Meighen to him to the effect that the land had been conveyed to Joseph would be admissible as a declaration against interest.

However, for such a declaration to be admissible it should relate to a statement of the decedent which is definite, certain, and unequivocal and distinctly import the fact of which it is offered as an assertion.[4] The evidence relating to the declaration should not be in the form of a conclusion, opinion, or understanding acquired by the witness from unexplained acts or words of the declarant. It is doubtful that the words "as I understood your father" are equivalent to the words "your father told me" in spite of defendants' contention that such purported fact was expressed by a colloquialism employed by people of German ancestry. The letter is not evidence of a statement of the fact of transfer of the property from the father to his son Joseph nor does it relate facts showing how Loosbrock came to "understand" that Thomas owned the land. The statement is not unequivocal and does not distinctly import the fact for which it is asserted and was therefore properly excluded.

■ Moreover, we are of the view that the trial court properly exercised its discretion in sustaining the objection to the letter on the ground of hearsay and lack of proper foundation. The probative value of the letter does not depend upon the writing contained within its four corners, but depends for its veracity upon Mr. Loosbrock's kowledge of the facts stated therein. Furthermore, the statements contained in it require explanation. Under the circumstances the plaintiff would be denied the right to cross-examine Loosbrock and the court would be denied the opportunity to observe his conduct and demeanor while testifying.[5]

■ In connection with defendants' contention that "The letter was written in the usual course of correspondence" and as such should be admitted, it is only necessary to observe that the letter was a casual

---

[4] 5 Wigmore, Evidence (3 ed.) § 1471(b); 20 Am. Jur., Evidence, § 546.
[5] McCormick, Evidence, § 224.

inquiry and not of such a character as to give it the status of a business entry so as to bring it within the business-records exception to the hearsay rule.[6]

■ In discussing the question of the weight and sufficiency of the evidence, it is unnecessary to further detail the evidence in order to demonstrate the absolute correctness of the trial court's findings of fact. Barnum v. Jefferson, 109 Minn. 1, 122 N. W. 453; Knutson v. Lasher, 219 Minn. 594, 18 N. W. (2d) 688. This court's duty is performed when it has considered all of the evidence in the light most favorable to the trial court's findings and has determined whether the findings are reasonably sustained by the evidence as a whole. Ehmke v. Hill, 236 Minn. 60, 51 N. W. (2d) 811; Board of Education v. Sand, 227 Minn. 202, 34 N. W. (2d) 689; Waldron v. Page, 191 Minn. 302, 253 N. W. 894; Callahan v. City of Duluth, 197 Minn. 403, 267 N. W. 361; 1 Dunnell, Dig. (3 ed.) §§ 411 and 415.

The trial court heard and observed the witnesses against the background of a bitter family dispute and is in a better position than are we to evaluate the credibility of the witnesses.[7] Under the circumstances we are reluctant to disturb the findings of the trial court for it must be acknowledged that there is a certain measure of truth to be found in the visible and audible manifestations of the witnesses, which are apparent to the trial court, but are not disclosed by the cold record. The findings of the trial court will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence and without reasonable evidentiary support. Inland Products Corp. v. Donovan Inc. 249 Minn. 387, 82 N. W. (2d) 691; Kiges v. City of St. Paul, 240 Minn. 522, 62 N. W. (2d) 363; Reiter v. Western State Bank, 240 Minn. 484, 62 N. W. (2d) 344, 42 A. L. R. (2d) 1064; Prince v. Sonnesyn, 222 Minn. 528, 25 N. W. (2d) 468; Cohen v. Steinke, 223

---

[6] 5 Wigmore, Evidence (3 ed.) § 1525; M. S. A. 600.02.

[7] With reference to the testimony of the late John F. D. Meighen, the trial court in its memorandum appropriately stated: "I wish to make a special point of the fact that there was no evidence of any dishonesty on the part of John F. D. Meighen. * * * His long and distinguished record of devoted service to the bench and bar of the State of Minnesota remains unblemished."

Minn. 292, 26 N. W. (2d) 843; Sullivan v. Brown, 225 Minn. 524, 31 N. W. (2d) 439; Kelly v. Kelly, 243 Minn. 114, 66 N. W. (2d) 606. This is true even though this court might have found the facts to be different had it heard the case de novo. Corah v. Corah, 246 Minn. 350, 75 N. W. (2d) 465; Loth v. Loth, 227 Minn. 387, 35 N. W. (2d) 542, 6 A. L. R. (2d) 176; In re Estate of Christ, 166 Minn. 374, 208 N. W. 22.

We think the trial court was correct in its conclusion that the acts and statements of the father, Thomas J. Meighen, were inconsistent with a gift of the entire 400-acre farm to his son Joseph. The trial court could not have disregarded the persuasive force of the father's memorandum of January 9, 1936, made approximately one month prior to his death, in which he noted that 240 acres of the Nobles County farm still remained in the name of his daughter Margaret, and the office folio of his nephew John, which confirmed that memorandum. Nor could the court have failed to be persuaded by the unexplained inconsistency of Joseph's contention that his father made a gift to him of the 400-acre farm in 1933 and then subsequently in 1936 gave him another deed covering part of the same property. It is not likely the father would have given him a deed to property he already claimed to own.

While it is true there is evidence in the record which is contrary to the contentions of the daughter Margaret, we are of the view that considering the evidence as a whole the record fairly supports the findings of the trial court.

Affirmed.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.